[No. B002744. Second Dist., Div. Seven. May 28, 1986.]

In re the Marriage of PEGGY GARRITY and NORRIS J. BISHTON, JR.
PEGGY GARRITY, Respondent, v.
NORRIS J. BISHTON, JR., Appellant.

## COUNSEL

Bishton & Jurecka and Stephen F. Moeller for Appellant.

Trope & Trope and William B. Anderson for Respondent.

## OPINION

**JOHNSON, J.**—This is an appeal from a further judgment on bifurcated issues following entry of an interlocutory judgment of dissolution of marriage. The appellant raises numerous issues in challenging the trial court's determinations concerning the proper division of property between the parties.

### STATEMENT OF FACTS AND PROCEEDINGS BELOW

The appellant, Bishton, and the respondent, Garrity, met in February 1979. Both are lawyers. They had each been previously married. Bishton had three children from his prior marriage while Garrity had four children.

In April or May 1979, Bishton and Garrity decided to get married. Prior to marriage, the parties entered into a premarital agreement. The agreement was initially an oral one. However, as part of this agreement, Bishton

subsequently prepared a written contract.[1] At the same time the parties signed the premarital agreement, they executed joint mutual wills. Bishton also subsequently placed his house in joint tenancy. Pursuant to the premarital agreement, each party's separate property was deemed community property and all property acquired after the signing of the agreement was likewise to be deemed community property. Each party was also to assume the role of a parent towards the other party's children and would continue to perform such role. In the event of the death of either party, it was their desire that the other party be designated the guardian of any minor children of the deceased and custody be awarded to the surviving spouse. If this was not allowed, the surviving spouse would maintain a "parent-like" interest in the children. The agreement further provided the joint wills[2] were not to be altered or revoked by either party without the consent of the other party as long as the parties were living and married to each other. Moreover, neither party was to make any gifts during his or her lifetime which would tend to defeat the disposition as established in the will.

Bishton and Garrity were married on July 6, 1979.

On August 10, 1982, Garrity filed a petition for dissolution of marriage.

Bishton filed a response on the same day.

On August 20, 1982, Garrity executed a will revoking her prior will executed at the time the premarital agreement was signed. She also executed a deed breaking the joint tenancy of the family residence.[3]

The parties separated on August 21, 1982.

---

[1] Bishton testified at trial the reason for entering into the agreement was in the event of the death of either one of the spouses, the survivor would have available to him or her all the assets of both spouses. This would enable the surviving spouse to be in a financial position to continue to act as a parent to all of the children. Garrity testified the purpose for entering into the agreement was simply to pool all of their resources together. The fate of the children was not of paramount concern. The written agreement itself stated the purpose of the agreement was to define the respective property rights of Bishton and Garrity.

[2] In their wills, Garrity and Bishton each devised all of their estate to the surviving spouse with the nonbinding expectation the surviving spouse would provide for all the children from their former marriages. Moreover, upon the death of the surviving spouse, his or her estate would be devised to all the children. This estate would be administered pursuant to a trust established in the will.

[3] Garrity testified she phoned Bishton from her office and suggested to him since they were going to get a divorce they should change their wills, their insurance policy beneficiary designation, and so forth. She asked him if he would consent to her changing her will. Bishton gave his consent. She likewise consented to his changing his will. She also testified, although she did not specifically request that they terminate the joint tenancy, she thought he consented to its termination since they had agreed to change everything. Bishton disputed any such agreement.

The trial commenced on July 12, 1983. The trial was bifurcated and the issues involving the prenuptial agreement and the instruments executed therewith were tried first. Bishton contended the agreement was breached by Garrity because after the separation she refused to allow him to act as a parent towards her children and she did not act as a parent toward his children[4], she revoked her will without his consent, and she revoked the joint tenancy. He contended the agreement should be rescinded as a result and he should have his former property rights restored. The trial court rejected Bishton's contentions.

After this ruling, the court heard evidence on the valuation and division of the parties' community property. The court issued its oral decision on the remaining issues on July 26, 1983. The decision provided in relevant part:

"The community property of the parties is found to be valued at and awarded as follows:

"The Hilltree property [the family residence] is awarded to the respondent [Bishton] at the value of $725,000 with the net figure of $533,302 . . . .

"The Court awards the petitioner's law practice to her at zero value.

"The Court awards the respondent's law practice to him at zero value
. . . .

"The Court finds that the Barnes case [a contingent fee wrongful death action worked on by both parties] is part of the petitioner's law practice, which assets of that practice are community property." In addition, the court assigned Garrity liabilities of $1,344.50 and assigned Bishton liabilities of $48,189. To equalize the division of property, the court ordered Bishton to pay Garrity $239,136.[5]

Both Bishton and Garrity requested a statement of decision pursuant to Code of Civil Procedure section 632. On October 14, 1983, the court adopted the statement of decision proposed by Garrity with certain modifications.

On the same date, the trial court entered its further judgment on the bifurcated issues, ruling in the manner discussed above.

---

[4]The conflicting testimony relative to this contention will be discussed *infra*.

[5]These figures were subsequently adjusted slightly. The court assigned Bishton liabilities of $49,851.59 and required Bishton make an equalizing payment of $241,296.74.

On November 1, 1983, Bishton filed his notice of appeal from the trial court's ruling.

On November 23, 1983, Garrity filed a notice of cross-appeal.[6]

DISCUSSION

### I. THE TRIAL COURT DID NOT ERR IN FAILING TO GRANT RESCISSION OF THE PREMARITAL CONTRACT AND INSTRUMENTS EXECUTED IN CONNECTION THEREIN

On June 7, 1979, Garrity and Bishton signed the written premarital agreement. The purpose of this agreement was to define the respective property rights of the parties. The agreement provided all of the property of the parties was to be deemed community property as was all property acquired after the date of agreement. The agreement also provided the intent of the parties was that each would assume the role of parent to the other's children and treat the children as if they were his or her own to the greatest extent possible. The parties also desired that in the event of the death of either of the parties, the surviving party be designated the guardian of any minor children of the deceased and be awarded custody. In any event, the surviving spouse would maintain a parent-like interest in the welfare of the deceased party's children. The parties also executed mutual wills which were not to be revoked or altered without the consent of the other party so long as both parties were living and married to each other.

Bishton testified after the separation, Garrity's children were in Wisconsin. He asked her if he could call and speak with them. She refused his request. Moreover, in the early part of September, she ordered him not to have any contact at all with her children. He also attempted to give one of Garrity's children a birthday gift. It was returned however. Bishton subsequently received a letter from her attorney ordering him not to have any contact with her children. In addition, to his knowledge, Garrity has not had any contact with any of Bishton's children.[7]

---

[6]Garrity's cross-appeal was subsequently dismissed for failure to procure a record on appeal.

[7]We note Garrity testified to a significantly different version of events. She testified she spoke with her children in Wisconsin several nights after she filed for the divorce. After she talked with the children, Bishton talked with them. He told them their mother had no right to tell them about the pending divorce and he can't live with Garrity anymore because of the way she treats them. His comments upset the children. Garrity, after learning of the conversation, told Bishton he was not going to talk to the children in that way and she didn't want him to talk to them. Bishton never subsequently asked to talk to her children or to see them. She also testified Bishton told his children not to talk with her or listen to her.

■ Bishton contends Garrity's conduct after the parties' separation constituted a repudiation of the premarital agreement and a failure to perform her promises under the agreement. In particular, Bishton argues after the separation, Garrity refused to allow him to continue in a parental role toward her children and she refused to have any contact with his children. Given this conduct, Bishton was entitled to declare a rescission of the agreement and have the property rights of the parties revert to the pre-agreement status. We disagree.

Critical to and implicit in Bishton's argument is the contention the parties intended the parental role provisions of the agreement to continue to have effect even upon separation or divorce. Bishton acknowledges no explicit provision appears in the agreement to this effect. Thus, in essence, Bishton wants this court to read such a provision into the agreement.

■ A premarital agreement is a contract subject to the general rules of contract interpretation. (See *Barham* v. *Barham* (1949) 33 Cal.2d 416, 422-423 [202 P.2d 289]; 1 Markey, Cal. Family Law Practice and Procedure § 2.60, p. 2-77.) Pursuant to contract principles, ". . . covenants or terms in an agreement may be implied only if the following conditions are met: (1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that is was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; and (5) there can be no implied covenant where the subject is completely covered by the contract. (*Stockton Dry Goods Co.* v. *Girsh* (1951) 36 Cal.2d 677 [227 P.2d 1, 22 A.L.R.2d 1460] [other cites omitted])." (*Hinckley* v. *Bechtel Corp.* (1974) 41 Cal.App.3d 206, 211-212 [116 Cal.Rptr. 33]; accord *Kessler* v. *General Cable Corp.* (1979) 92 Cal.App.3d 531, 541 [155 Cal.Rptr. 94]; see also *Sayble* v. *Feinman* (1978) 76 Cal.App.3d 509, 515 [142 Cal.Rptr. 895] ["This court has neither the power to make for the parties a contractual arrangement which they themselves did not make nor to insert in the agreement language that appellants now wish were there. (Cites omitted.)"]

■ Both parties testified there was no discussion concerning this issue. As Bishton testified: "There was never any discussion whatsoever as to what would happen in the event of divorce. The only discussion that we had were along the lines that we were both taking on this responsibility towards the other's children for the rest of our lives. [¶] It was a serious discussion as to what would happen. It was never considered what would happen in the event of a divorce." Garrity testified to this same effect. As she testified:

"We promised to stay—we were getting married, but beyond that, there were no discussions regarding the agreement being more than a marriage."

The trial court found Garrity was excused from performance of the agreement after separation because "[t]here was no mutual understanding that the written premarital contract would remain in effect in the event of the parties' separation and/or dissolution of their marriage."[8]

As is manifest by the testimony of both parties, the factual basis for the court's decision is undisputed. Moreover, we believe the court acted properly in not implying a provision for the continuation of the parental obligations upon separation or divorce. The implication certainly does not arise from the language of the agreement.[9] Moreover, as the parties' testimony establishes, this provision was not within the contemplation of the parties such that they could be deemed to have found it unnecessary to express it. In addition, it cannot be assumed that the parties would have agreed to such a provision had attention been called to it. It does not follow from the fact each spouse agreed to treat the children of the other spouse as his/her own during marriage that they would also have agreed to this arrangement if separation or divorce occurred. Given the circumstances of this case, we do not believe this is an appropriate one to imply the provision requested.

In arguing Garrity's actions constituted breaches of the agreement justifying rescission, Bishton relies principally on three cases—*Estate of Warner* (1907) 6 Cal.App. 361 [92 P. 191], sub. opn. (1910) 158 Cal. 441 [111 P. 352], and sub. opn. (1914) 168 Cal. 771 [145 P. 504]; *Roy* v. *Roy* (1938) 29 Cal.App.2d 596 [85 P.2d 223]; and *Estate of Barrow* (1938) 27 Cal.App.2d 402 [80 P.2d 1006]. However, in each of these cases, the breach of the agreement which justified rescission was of a material provision clearly expressed in the agreement. (See *Estate of Warner, supra,* 6 Cal.App.

---

[8]The trial court also found Garrity's post-separation actions did not constitute a breach of the agreement for other reasons. First, the court found the promise that the parties would perform the role of a parent to the children of the other party was not a material consideration for the contract. The primary purpose of the written agreement was to define the respective property rights of Bishton and Garrity. "Case law has uniformly held that a failure of consideration must be 'material,' or go to the 'essence' of the contract before rescission is appropriate. (Cites omitted.)" (*Wyler* v. *Feuer* (1978) 85 Cal.App.3d 392, 403-404 [149 Cal.Rptr. 626].) Second, the court found this promise to be indefinite and uncertain such that it was unenforceable by the court. Both of these findings are amply supported by the record.

[9]Indeed, the language of the agreement suggests the opposite conclusion. As the agreement provides in relevant part: "It is the intent of the parties hereto that, *to the greatest extent possible,* each will assume the role of parent to the other's children and shall treat the children of the other party as if they were his or her own." (Italics added.) What is possible at a time when the parties are happily married and living together is certainly not the same at a time when the parties are physically separated and their emotional ties are strained.

at pp. 363, 365-366; *Roy* v. *Roy, supra,* 29 Cal.App.2d at pp. 601-602; *Estate of Barrow, supra,* 27 Cal.App.2d at pp. 403, 405-406.) As such, these cases are readily distinguishable from the case at bar where the agreement was silent as to the provision which Bishton is seeking to enforce and the circumstances do not justify implying such a provision.

■ Bishton also argues since the trial court found the agreement terminated at the time of separation, he is entitled to restitution for property rendered under the agreement. As Bishton states, when a court finds a contract has terminated, the parties' rights are governed by general equitable principles. In the case at bar, these general equitable principles should compel restitution since property of both parties which otherwise would have been separate property was transmuted into community property as a result of the written premarital contract.[10]

Bishton's argument is focused in its entirety on the parties' written premarital contract. We find his argument misplaced in this regard since the trial court specifically found the parties' oral agreement to transmute their property, entered into prior to the written agreement, was fully executed. Thus, the court's finding of termination relative to the written agreement had no bearing on the already accomplished transmutation of the parties' property.

Parties prior to marriage may by agreement transmute separate property into community property. Such transmutation is effective even if the agreement is an oral one if subsequent to the marriage it is executed. Execution is disclosed by acts and conduct in confirmation of the agreement. (*Woods* v. *Security-First Nat. Bank* (1956) 46 Cal.2d 697, 701 [299 P.2d 657]; *Estate of Dokoozlian* (1963) 219 Cal.App.2d 531, 535-536 [33 Cal.Rptr. 151].) In the case at bar, Garrity testified prior to their marriage the parties orally agreed to transmute all of their separate property to community property. They agreed to pool everything together. The purpose of the written agreement was to put into writing what their oral agreement was—to treat everything as community property. The written agreement did not alter this

---

[10]We note the trial court's conclusion in this regard was reached primarily in response to the issue of the duration of the after-acquired property provision in the agreement. This provision provided: "From and after the date hereof [the date of signing the agreement], all property acquired by Bishton and Garrity, . . . shall be deemed community property." The court ruled the separation of the parties in effect terminated this provision of the agreement. The court concluded it was inconceivable the parties would have intended that property accumulated after separation would continue to be deemed community property. Indeed, we believe the terms of the agreement itself provide for this result. The agreement provided the provisions therein were to be governed by the laws of the State of California. It is basic law in California that the earnings of a spouse living separate and apart from the other spouse are his/her separate property. (Civ. Code, § 5118.)

basic understanding and the effect of their oral agreement.[11] Pursuant to their agreement, Garrity listed and sold her house and combined her funds and assets with Bishton's funds and assets. In addition, title to the Hilltree property was placed in both parties' names. The parties continued to act pursuant to this arrangement during marriage. Based on these actions, the trial court found the oral premarital agreement was fully executed. As is apparent from the above discussion, substantial evidence supports the court's determination in this regard.[12]

## II. THE TRIAL COURT DID NOT FAIL TO MAKE AN ADEQUATE STATEMENT OF DECISION

■ Bishton contends the trial court erred in failing to state reasons for its rulings as is required by Code of Civil Procedure section 632. In particular, Bishton argues the court failed to provide reasons for its rulings regarding termination of the premarital contract, denying restitution, and not compensating him for having to carry almost all of the community obligation. We conclude, however, the court met the requirements of section 632.

Code of Civil Procedure section 632 provides in relevant part: "Upon the request of any party appearing at the trial, . . . the court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the controverted issues at trial."

In *People* v. *Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 524 [206 Cal.Rptr. 164], the court in examining the requirements of section 632 stated: "A trial court in rendering a statement of decision under Code of Civil Procedure section 632 is required only to state ultimate rather than evidentiary facts. [Citations.] . . . [¶] . . . Only where a trial court fails to make findings as to a material issue which would

---

[11]As discussed earlier, the trial court found: "The promise of each to perform the role of a parent to the children of the other and consent to allow the other party to so act was not material consideration for the contract." This finding is supported by substantial evidence. As the agreement itself provides: "The purpose of this Agreement is to define the respective property rights of Bishton and Garrity."

[12]In his initial briefing and at oral argument, Bishton argued, pursuant to Civil Code section 4800.2, he was at least entitled to reimbursement for his separate contributions of Hilltree House and the various items of personal property which were his separate property prior to the marriage. This section provides in relevant part: "In the division of community property under this part unless a party has made a written waiver of the right to reimbursement or signed a writing that has the effect of a waiver, the party shall be reimbursed for his or her contributions to the acquisition of the property to the extent the party traces the contributions to a separate property source." However, after oral argument, the Supreme Court ruled in *In re Marriage of Fabian* (1986) 41 Cal.3d 440, 451 [224 Cal.Rptr. 333, 715 P.2d 253] that Civil Code section 4800.2 could not be retroactively applied to dissolution actions pending on January 1, 1984. Bishton acknowledges the holding in *Fabian* applies to the case at bar and he cannot obtain reimbursement under section 4800.2.

fairly disclose the determination by the trial court would reversible error result. [Citation.] Even though a court fails to make a finding on a particular matter, if the judgment is otherwise supported, the omission to make such finding is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings. [Citation.] A failure to find on an immaterial issue is not error. [Citation.]" (Accord *Wolfe* v. *Lipsy* (1985) 163 Cal.App.3d 633, 643-644 [209 Cal.Rptr. 801].)

In the case at bar, the trial court's statement of decision fairly and completely set forth the factual and legal basis for its decision. It listed all the ultimate facts necessary to decide the issues placed in controversy. Indeed, the court's statement of decision was extremely detailed and precise.[13] We are hard pressed to understand the basis for Bishton's challenge in this regard.

In support of his position, Bishton relies on *In re Marriage of Hargrave* (1985) 163 Cal.App.3d 346 [209 Cal.Rptr. 764]; *Miramar Hotel Corp.* v. *Frank B. Hall & Co.* (1985) 163 Cal.App.3d 1126 [210 Cal.Rptr. 114];

---

[13]The statement of decision provided in relevant part:

"A. As to the issue of respondent's right of rescission [*sic*] of the premarital contract and other instruments and the termination of the premarital contract:

"1. In March 1979, the parties entered into an oral agreement to pool their property and treat all property as community property which was fully executed on petitioner's part by listing and selling her house, combining her funds and assets with respondent prior to and during marriage, and marrying respondent.

"2. The parties signed a written premarital contract and will on June 7, 1979 prepared by respondent after he had obtained independent tax advice. . . .

"3. The primary purpose of the written agreement was to define the respective property rights of the parties.

"4. By reason of the agreement each party's separate property was deemed to be community property. . . .

"8. The promise of each to perform the role of a parent to the children of the other and consent to allow the other party to so act was not material consideration for the contract.

"9. The promise of each to perform the role of a parent towards the other party's children and to consent to the other party's so acting was indefinite and uncertain and was not a promise subject to enforcement by the Court.

"10. . . . . [Even if the opposite conclusions were reached in 8 and 9 above], petitioner was excused from performance after separation by reason of each of the following facts: e) There was no mutual understanding that the written premarital contract would remain in effect in the event of the parties' separation and/or dissolution of their marriage.

"11. Petitioner obtained respondent's consent on August 20, 1982 to revoke her will of June 7, 1979 and consent was obtained prior to the execution of her will dated August 20, 1982. . . .

"14. Petitioner's execution of the deed dated August 20, 1982 and recorded August 30, 1982 breaking the joint tenancy on the Hilltree property did not alter the community property character of the property and did not constitute a breach of the written premarital contract."

With respect to the issue of the inequality in division of community liabilities, the court explicitly remedied this inequality when dividing the parties' interest in the family residence. See discussion *infra*.

and *In re Marriage of S.* (1985) 171 Cal.App.3d 738 [217 Cal.Rptr. 561]. However, these cases are readily distinguishable from the case at bar.

In *Hargrave,* the wife was provided *no explanation* of the factual and legal basis of the referee's determination of the value of goodwill of the husband's business despite her objections. *(In re Marriage of Hargrave, supra,* 163 Cal.App.3d at pp. 353-354.) In *S.,* the court failed to file a statement of decision when a timely request was made. *(In re Marriage of S., supra,* 171 Cal.App.3d at pp. 746-750.) Finally in *Miramar,* the court's purported statement of decision was largely comprised of legal conclusions and the court deprived the appellants of an opportunity to make proposals and objections concerning the court's statement of decision. *(Miramar Hotel Corp.* v. *Frank B. Hall & Co., supra,* 163 Cal.App.3d at pp. 1127-1129.)

III. THE TRIAL COURT ERRED IN VALUING GARRITY'S LAW PRACTICE AT $0.

 Bishton contends the trial court erred in finding Garrity's law practice had no value. We agree.

In its statement of decision, the trial court stated the most appropriate method for valuing the good will and practice of each party was the excess earnings method.[14] Utilizing this method in the case at bar, the court found Garrity's practice had no value. We do not believe this method was the appropriate one for valuing Garrity's law practice.

In *In re Marriage of Lopez* (1974) 38 Cal.App.3d 93 [113 Cal.Rptr. 58], disapproved on other grounds in *In re Marriage of Morrison* (1978) 20 Cal.3d 437, 453 [143 Cal.Rptr. 139, 573 P.2d 41], the court set forth the assets and liabilities which a trial court should examine in determining the value of a law practice. These included: "(a) fixed assets, which we deem to include cash, furniture, equipment, supplies and law library; (b) other assets, including properly aged accounts receivable, costs advanced with due regard for their collectability; work in progress partially completed but

---

[14]Pursuant to this method, one first determines a practitioner's average annual net earnings (before income taxes) by reference to any period that seems reasonably illustrative of the current rate of earnings. One then determines the annual salary of a typical salaried employee who has had experience commensurate with the spouse who is the sole practitioner or sole owner/employee. Next, one deducts from the average net pretax earnings of the business or practice a "fair return" on the net tangible assets used by the business. Then, one determines the "excess earnings" by subtracting the annual salary of the average salaried person from the average net pretax earning of the business or practice remaining after deducting a fair return on tangible assets. Finally, one capitalizes the excess earnings over a period of years by multiplying it by a factor equal to a specific period of years, discounted to reflect present value of the excess earnings over that period. The period varies according to factors such as the type of business, its stability, and its earnings trend.

not billed as a receivable, and work completed but not billed; (c) goodwill of the practitioner in his law business as a going concern; and (d) liabilities of the practitioner related to his business." (*Id.*, at p. 110; accord 2 Markey Cal. Family Law Practice and Procedure § 24.47 [2], pp. 24-62–24-64.) We believe this method provides a realistic measure of a practice's actual value.

The method utilized by the trial court fails to take into account a practice's fixed assets, properly aged accounts receivable, costs advanced, work in progress not billed, etc. We fail to see how a proper determination of the practice's value can be established without a assessment of these factors.[15]

■ Bishton also contends the trial court erred in failing to award him any fees and costs recovered in a contingent fee wrongful death case he and Garrity worked on. We disagree.

On August 9, 1982, Bishton and Garrity negotiated a settlement with one of the defendants in the above case. Garrity's law practice received $52,902.70 in fees and reimbursements for costs as a result of this settlement. Bishton contends he should have received half this amount. However, when all the evidence relative to this issue is examined, this contention must fail. As Garrity testified, this settlement was reached with only one of the defendants. The case still went to trial. The jury returned a verdict for $230,260 but found the plaintiff 45 percent comparatively negligent. The amount of fees Garrity received as a result of the above recoveries was not enough to cover her expenditures on the case. Thus, instead of the windfall alleged by Bishton, Garrity suffered a loss on the case.[16]

■ Finally, as discussed earlier, the trial court also used the excess earnings method to assess the value of Bishton's law practice and in utilizing

---

[15]Expert testimony provided at trial supports this determination. Bishton's expert witness, in evaluating Bishton's law practice, utilized a method similar in part to the method described in *Lopez*. The figure arrived at, $55,400, was a combination of Bishton's share of the accounts receivable reduced by a 20 percent allowance for uncollectable accounts, his share of the furniture, his responsibility for cash overdraft, and his share of the liabilities. The expert utilized the excess earnings method merely to determine there was no goodwill. However, as in the case of Garrity's practice, the trial court used the excess earnings method to determine Bishton's practice had no value. The testimony of Garrity's expert witness on this issue is also instructive. He testified he used the excess earnings method to demonstrate there were no excess earnings to capitalize. He did not use this method as the primary method for assigning a value to the practice. Thus although the practice had zero excess earnings, it definitely had a value greater than zero. Indeed, the expert testified the value of the practice was $104,225.

[16]We also note the trial court took the *Barnes* case into account when determining the value of Garrity's practice. As the court properly stated, ". . . . [A]ny separate treatment of the Barnes lawsuit would provide conflicting and overlapping valuation/division contrary to the law."

this method, likewise valued his practice at $0. The trial court erred in this regard and this determination must likewise be reversed.

■ Bishton contends, however, since the issue of the value of his practice was not before this court on appeal, it is inappropriate for this court to address the propriety of the trial court's determination. We disagree.

As a general rule, a judgment becomes final against a nonappealing party even though reversed on the appeal of another party. However such a rule does not apply "where portions of the judgment adverse to a nonappealing party are so interwoven with the whole that appeal from a part affects the other parts; in such a situation, the appellate court can reverse the entire judgment if it is necessary to do justice. (*Blache* v. *Blache,* 37 Cal.2d 531, 538 [233 P.2d 547]; *Estate of McDill,* 14 Cal.3d 831, 840-841 [122 Cal.Rptr. 754, 537 P.2d 874].)" (*Patillo* v. *Norris* (1976) 65 Cal.App.3d 209, 219 [135 Cal.Rptr. 210].) "The test of whether a portion of a judgment appealed from is so interwoven with its other provisions as to preclude an independent examination of the part challenged by the appellant is whether the matters or issues embraced therein are the same as, or interdependent upon, the matters or issues which have not been attacked. (Cites omitted.) '. . . [T]he judgment is severable when the original determination of those issues by the trial court and reflected in the judgment or any determination which could be made as the result of an appeal cannot affect the determination of the remaining issues of the suit . . . .' (Cite omitted.)" (*American Enterprise, Inc.* v. *Van Winkle* (1952) 39 Cal.2d 210, 217 [246 P.2d 935]; accord *Estate of McDill, supra; Gonzales* v. *R.J. Novick Constr. Co.* (1978) 20 Cal.3d 798, 805-806 [144 Cal.Rptr. 408, 575 P.2d 1190].)

■ In the case at bar, the issue raised on appeal by Bishton is whether the formula utilized by the trial court in assessing the value of Garrity's law practice was the proper one. This is the same issue relative to the court's valuation of Bishton's law practice, i.e., did the trial court use the proper formula in valuing his law practice. *The court used the same formula in both instances.* As such, the issues are clearly interwoven. Either the formula utilized by the trial court was proper in both instances or it was improper in both instances. We note this is not a situation in which the court utilized the correct formula but simply miscalculated with respect to one of the law practices. The formula itself was incorrect.

We recognize it can be argued since the valuation of the respective law practices was arrived at through completely distinct calculations, i.e., each practice had completely separate assets, these decisions are not interwoven. However, we do not believe the principle discussed above should be applied in such a limited fashion. To do so would be to allow the very injustice it

was established to prevent. In the case at bar, the trial court utilized the same, exact formula in valuing both practices. This formula was obviously inappropriate as applied to both practices. It is the utilization of this formula which Bishton is challenging, not the valuation of particular assets. Given this, the trial court should reassess the value of both practices utilizing the correct formula.[17]

## VI. THE TRIAL COURT DID NOT ERR IN ALLOCATING MOST OF THE COMMUNITY OBLIGATIONS TO BISHTON

The trial court assigned Garrity $1,344.50 in community obligations. It assigned Bishton $49,851.59 in community obligations. Bishton contends this inequality in distribution of the obligations was in error.

Civil Code section 4800 provides in relevant part: "(a) . . . [T]he court shall . . . divide the community property and the quasi-community property of the parties equally . . . (b) Notwithstanding subdivision (a), the court may divide the community property and quasi-community property of the parties as follows: (1) Where economic circumstances warrant, the court may award any asset to one party on such conditions as it deems proper to effect a substantially equal division of the property." In interpreting this section, the Supreme Court in *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 748 [131 Cal.Rptr. 873, 552 P.2d 1169], stated: "In dividing the community property equally under the mandate of Civil Code section 4800, subdivision (a), the court must distribute both the assets and the obligations of the community *so that the residual assets awarded to each party after the deduction of the obligations are equal.*" (Italics added.) (Accord *In re Marriage of Barnert, supra,* 85 Cal.App.3d at pp. 420-421.) Moreover, as stated in subdivision (b), a trial court may award a single asset entirely to one of the spouses provided it awards that asset on such conditions necessary to effect an equal division of the property. (See *In re Marriage of Bridgen* (1978) 80 Cal.App.3d 380, 390 [145 Cal.Rptr. 716].) For instance, when a court awards one of spouses the family residence and the residence is the only substantial asset, such an award would generally be conditioned upon the spouse paying the other party money equivalent to that party's one-half interest in the house. (*Badillo* v. *Badillo* (1981) 123 Cal.App.3d 1009, 1011-1012 [177 Cal.Rptr. 56]; *In re Marriage of Eastis* (1975) 47 Cal.App.3d 459, 462, fn. 1 [120 Cal.Rptr. 861].)

---

[17]We note the cases relied upon by Bishton in this regard, *In re Marriage of Hargrave, supra,* 163 Cal.App.3d 346; *In re Marriage of King* (1983) 150 Cal.App.3d 304 [197 Cal.Rptr. 716]; *In re Marriage of Rives* (1982) 130 Cal.App.3d 138 [181 Cal.Rptr. 572]; *In re Marriage of Barnert* (1978) 85 Cal.App.3d 413 [149 Cal.Rptr. 616], did not address this issue and are thus of little relevance.

In the case at bar, the court awarded Garrity obligations in the amount of $1,344.50 while awarding Bishton obligations in the amount of $49,851.59. However, the court awarded Bishton the family residence which had a present equity of $533,302. Given its community property status, Garrity would have been entitled to one-half of the house's equity or $266,651. Yet, the court recognized the disparity in the party's assumed obligations and thus only ordered Bishton to pay Garrity $241,296.74. Had the court imposed equal debt obligations, Bishton would have owed Garrity her full one-half interest. Thus, what Bishton would have gained in terms of a lesser amount of debt to third parties would have been offset by the increase in the cash-to-equalize payment to Garrity. Given that the net effect would be the same, the court did not err in this regard.

## DISPOSITION

The matter is remanded to the trial court to determine the value of the parties' respective law practices in accordance with the principles discussed in this case and to reapportion the parties' respective community property shares accordingly. Both parties to bear their own costs on appeal. In all other respects, the decision is affirmed.

Lillie, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied June 18, 1986.