Filed 4/25/17

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF SANTA MARIA, | C081190 |
| Plaintiff and Appellant, | (Super. Ct. No. 34201480001918CUMWGDS) |
| v. | |
| MICHAEL COHEN, as Director, etc., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Michael P. Kenny, Judge. Reversed.

Aleshire & Wynder, June S. Ailin and Lona N. Laymon for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Douglas J. Woods, Senior Assistant Attorney General, Stepan A. Haytayan, Deputy Attorney General, Jeffrey A. Rich, Deputy Attorney General, for Defendants and Respondents.

1

As successor to the former Redevelopment Agency of the City of Santa Maria, the City of Santa Maria owns parking facilities that were acquired and/or constructed with the proceeds of certain bonded indebtedness dating back to 1984.[1] The city leases the parking facilities from the city as successor. The bonded indebtedness was most recently refinanced with bonds issued in 2003.

In May 2012, the city as successor sought approval from the California Department of Finance (the department) to make payments due on the 2003 bonds from the redevelopment property tax trust fund (the fund). The department determined that the fund should not be used to make the bond payments because subdivision (a)(2)(B) of Health and Safety Code[2] section 34183 provides that the fund can be used for payments to be made on revenue bonds "only to the extent the revenues pledged for [the bonds] are insufficient to make the payments and only where the agency's tax increment revenues were also pledged for the repayment of the bonds." The department concluded that subdivision (a)(2)(B) of section 34183 applied because the bonds at issue "did not have tax increments pledged and therefore, must be paid with other funding sources."

The city and the city as successor commenced the present mandamus action against the department and its director (jointly, the department) to challenge the department's determination that the fund could not be used for the bond payments. The trial court agreed with the department that because tax increment revenues were not expressly pledged to satisfy the bond payments, the city as successor was not entitled to use the fund to make the bond payments under subdivision (a)(2)(B) of section 34183. The trial court further concluded, however, that to the extent the city's lease payments for

---

[1] We will refer to the former Redevelopment Agency of the City of Santa Maria as the agency. We will refer to the City of Santa Maria acting in its capacity as successor to the agency as the city as successor and otherwise as the city.

[2] All further section references are to the Health and Safety Code.

the parking facilities are insufficient to cover the bond payments, the city as successor *is* entitled to use the fund to make the bond payments under subdivision (a)(2)(C) of section 34183, which allows the fund to be used for "[p]ayments scheduled for other debts and obligations listed in the Recognized Obligation Payment Schedule that are required to be paid from former tax increment revenue."

On appeal from the judgment partially granting their writ petition, the city and the city as successor contend the trial court erred in concluding that under subdivision (a)(2)(C) of section 34183 the city's lease payments must be used first to make the bond payments and that the city as successor is entitled to use the fund for the bond payments only to the extent the lease payments are insufficient. In response, the department contends the trial court was correct in concluding that the city as successor is not entitled under subdivision (a)(2)(C) of section 34183 to use the fund first to make the bond payments. The department further contends, however, the trial court erred in concluding that the city as successor *is* entitled under that subdivision to use the fund to make the bond payments to the extent the city's lease payments are insufficient for that purpose.

For the reasons set forth below, we agree with the trial court that the city as successor is not entitled to use the fund to make the bond payments under subdivision (a)(2)(B) of section 34183. We further conclude that subdivision (a)(2)(C) of the statute does not apply to payments scheduled to be made on revenue bonds, and the trial court erred in concluding otherwise. Accordingly, we will reverse and remand with directions to enter judgment in favor of the department.

LEGAL BACKGROUND

Before June 2011, the Community Redevelopment Law (§ 33000 et seq.) authorized cities and counties to establish redevelopment agencies to remediate urban decay and revitalize blighted communities. (*California Redevelopment Assoc. v. Matosantos* (2011) 53 Cal.4th 231, 245-246.) To finance their activities, redevelopment

3

agencies relied on "tax increment financing . . . . [Citations.] Under this method, those public entities entitled to receive property tax revenue in a redevelopment project area (the cities, counties, special districts, and school districts containing territory in the area) [we]re allocated a portion based on the assessed value of the property prior to the effective date of the redevelopment plan. Any tax revenue in excess of that amount--the tax increment created by the increased value of project area property--[went] to the redevelopment agency for repayment of debt incurred to finance the project. [Citations.] In essence, property tax revenues for entities other than the redevelopment agency [we]re frozen, while revenue from any increase in value [wa]s awarded to the redevelopment agency on the theory that the increase [wa]s the result of redevelopment." (*Id.* at pp. 246-247.)

In June 2011, as a partial means of closing the state's projected budget deficit, the Legislature passed, and the Governor signed, Assembly Bill XI 26, which, in addition to other things, "dissolve[d] all redevelopment agencies [citation] and transfer[red] control of redevelopment agency assets to successor agencies, which are contemplated to be the city or county that created the redevelopment agency." (*California Redevelopment Assoc. v. Matosantos*, *supra*, 53 Cal.4th at p. 251.) Under this law, the successor agency "is a separate public entity from the public agency that provides for its governance and the two entities shall not merge. The liabilities of the former redevelopment agency shall not be transferred to the sponsoring entity and the assets shall not become assets of the sponsoring entity." (§ 34173, subd. (g).) Furthermore, "[t]he liability of any successor agency, acting pursuant to the powers granted under the act adding this part, shall be limited to the extent of the total sum of property tax revenues it receives pursuant to this part and the value of assets transferred to it as a successor agency for a dissolved redevelopment agency." (*Id.*, subd. (e).)

A successor agency is required to "[c]ontinue to make payments due for enforceable obligations" (§ 34177, subd. (a)), which include "[b]onds, as defined by

4

Section 33602 and bonds issued pursuant to Chapter 10.5 (commencing with Section 5850) of Division 6 of Title 1 of the Government Code, including the required debt service, reserve set-asides, and any other payments required under the indenture or similar documents governing the issuance of the outstanding bonds of the former redevelopment agency" (§ 34171, subd. (d)(1)(A)).  To that end, a successor agency is required to prepare, and submit to the department for approval, a recognized obligation payment schedule (ROP schedule) for every six-month fiscal period from January 1, 2012 through June 30, 2016.  (§§ 34171, subd. (h), 34177, subds. (a)(1), (*l*) & (m).)  An ROP schedule "set[s] forth the minimum payment amounts and due dates of payments required by enforceable obligations for each six-month fiscal period."  (§ 34171, subd. (h).)  For each recognized obligation, the schedule must "identify one or more sources of payment."  (§ 34177, subd. (*l*)(1).)  Among the possible sources of payment is the fund (*id.*, subd. (*l*)(1)(E)), into which the county auditor-controller is charged with depositing "the amount of property taxes that would have been allocated to each redevelopment agency in the county had the redevelopment agency not been dissolved" (§ 34182, subd. (c)(1)).  The fund is available as a source of payment, however, "only to the extent no other funding source is available or when payment from property tax revenues is required by an enforceable obligation or by the provisions of this part." (§ 34177, subd. (*l*)(1)(E).)

Section 34183 dictates how the county auditor-controller is to allocate moneys in the fund.  After making certain allocations not relevant here (§ 34183, subd. (a)(1)), the county auditor-controller is directed to make the following allocations:

"[O]n June 1, 2012, and each January 2 and June 1 thereafter, to each successor agency for payments listed in its Recognized Obligation Payment Schedule for the six-month fiscal period beginning January 1, 2012, and July 1, 2012, and each January 2 and June 1 thereafter, in the following order of priority:

"(A) Debt service payments scheduled to be made for tax allocation bonds.

5

"(B) Payments scheduled to be made on revenue bonds, but only to the extent the revenues pledged for them are insufficient to make the payments and only if the agency's tax increment revenues were also pledged for the repayment of the bonds.

"(C) Payments scheduled for other debts and obligations listed in the Recognized Obligation Payment Schedule that are required to be paid from former tax increment revenues."  (§ 34183, subd. (a)(2).)

With this legal background in mind, we turn to the facts of this case.

FACTUAL AND PROCEDURAL BACKGROUND

In 1984, the agency issued "Certificates of Participation" (the bond debt) to finance the purchase of land and a public parking facility from the city and to construct a second parking structure.  The deal was structured so that the city would lease the parking facilities from the agency, and the city's lease payments would be used to make the bond payments.

The bond debt was refinanced in 1986, 1993, and 2003.  As pertinent here, section 5.01 of the 2003 indenture of trust for the bond debt provides as follows:

"(a)    Payable from Tax Revenues.  The Bonds constitute an obligation and indebtedness of the Agency which is payable from the Tax Revenues.  The Agency shall comply with all requirements of law to insure the allocation and payment to it of the Tax Revenues, including without limitation the timely filing of any necessary statements of indebtedness . . . as required to enable the Agency to pay the principal of and interest on the Bonds from Tax Revenues to the extent the Tax Revenues received by the Agency are sufficient for that purpose.  Notwithstanding the foregoing, (i) the Bonds are not secured by a pledge of or lien on the Tax Revenues, and (ii) the Agency may use the Tax Revenues for any other lawful purposes of the Agency in any Fiscal Year, notwithstanding that such other use of the Tax Revenues may cause the available Tax Revenues to be insufficient to pay in full the principal of and interest on the Bonds coming due in that Fiscal Year.

6

"(b)    Pledge of Lease Revenues and Other Amounts.  Subject only to the provisions of this Indenture . . . , all of the Lease Revenues and all amounts (including proceeds of the sale of the Bonds) held in any fund or account established under this Indenture are hereby pledged to secure the payment of the principal of and interest and premium (if any) on the Bonds in accordance with their terms and the provisions of this Indenture.  Said pledge constitutes a lien on and security interest in the Lease Revenues and such amounts and shall attach, be perfected and be valid and binding from and after the Closing Date . . . ."

Section 4.3 of the second amended and restated lease agreement from 2003 also provides as follows:

"(b)  Credit for Payments Made by Agency.  The City and the Agency acknowledge and agree that the Bonds are payable from Tax Revenues of the Agency derived by the Agency from the Redevelopment Project, and that it is the intention of the Agency to pay the principal of and interest on the Bonds from that source.  To the extent that the Agency deposits Tax Revenues derived by it from the Redevelopment Project with the Trustee, the amounts so deposited with the Trustee and held by it in the Bond Fund, the Interest Account and the Principal Account on any Lease Payment Date shall be credited towards the Lease Payments which the City would otherwise be required to pay hereunder on that Lease Payment Date."

Following the dissolution of all redevelopment agencies in 2011, the city took over as the successor to the agency.  In May 2012, the oversight board of the city as successor approved an amended ROP statement for the period ending June 30, 2012.  This amended ROP statement included the bond debt as the first item on the statement and requested a distribution from the fund of $2,681,325.  At the same time, the oversight board approved the city as successor's second ROP statement, for the period ending December 31, 2012.  This ROP statement also included the bond debt as a proposed enforceable obligation and listed an amount requested of $2,636.012.

7

On May 21, 2012, the department objected to the June 30, 2012, and December 31, 2012, ROP statements, stating as follows in a letter to the city as successor: "Form A, Item No. 1 listed on both ROP statements is a Lease Revenue Bond in the amount of $2.6 million. Section 34183(2)(B) states [the fund] can fund revenue bonds, but only to the extent the revenues pledged for them are insufficient to make the payments and only where the agency's tax increment revenues were also pledged for the repayment of the bonds. This line item did not have tax increments pledged and therefore, must be paid with other funding sources."

On May 25, 2012, the city as successor provided its response to the department's position. The city as successor construed the department's May 21 letter as "mean[ing] that the [d]epartment . . . does not recognize these bonds as an 'enforceable obligation' of the City's former redevelopment agency under ABx1 26." The city as successor "urge[d] the [d]epartment . . . to reverse its opinion concerning these Bonds," stating as follows: "Under the 2003 agreement, the Bonds are to be paid from tax increment. . . . Although the indenture also provides for other funding sources in the Agency's discretion, in particular, the lease revenues from the lease dated March 1, 2003; the Bond payments were clearly intended to be paid with tax increment revenues. In fact, the City has used all of the tax increment it has ever received to make payments on the Bonds. Unfortunately, for the City, the amount of available tax increment since the original issuance of bonds in 1986, and continuing to the present, has never been sufficient to render full payment owed to the bond holders, and therefore, additional sums have come from the lease revenues paid by the City's General Fund."

On May 30, 2012, the department issued its final determination regarding the two ROP statements, stating that it was approving all items, "except for items disallowed in whole or in part as enforceable obligations noted in Finance's letter dated May 21, 2012."

The city and the city as successor (jointly, petitioners) commenced the present action on August 7, 2014, by filing a petition for writ of mandate and complaint for declaratory and injunctive relief. Petitioners sought a writ of mandate ordering the department to recognize the bond debt as an enforceable obligation and to allow the bond debt service to be paid from the fund. Petitioners further sought related declaratory and injunctive relief.

The trial court agreed with the department that because tax increment revenues were not expressly pledged to satisfy the bond payments, the city as successor was not entitled to use the fund to make the bond payments under subdivision (a)(2)(B) of section 34183. The trial court further concluded, however, that to the extent the city's lease payments are insufficient to cover the bond payments, the city as successor *is* entitled to use the fund to make the bond payments under subdivision (a)(2)(C) of section 34183 because in the event of such insufficiency "tax revenue is 'required' to prevent the Successor Agency from defaulting on the Bond Debt." Finally, the trial court rejected petitioners' argument that if the city as successor was not entitled to use the fund to make *all* bond payments, the city would be in violation of California's constitutional debt limit.

Based on the foregoing conclusions, the trial court granted the mandamus petition "in part, in that [the department] is ordered to recognize the Bond Debt as an enforceable obligation and to allow the Bond Debt to be paid with [the fund] to the extent the payments due and owing under the Lease are insufficient to satisfy the amount due on the Bond." Petitioners timely appealed from the judgment. The department did not appeal or cross-appeal.

DISCUSSION

On appeal, petitioners contend the trial court erred in determining that the lease payments have to be used to make the bond payments before the city as successor is entitled to draw on the fund for that purpose. In advancing this contention, petitioners do *not* argue that the city as successor is entitled to use the fund under subdivision (a)(2)(B)

9

of section 34183. In other words, they concede that the agency's tax increment revenues were not "pledged for the repayment of the bonds," as required by subdivision (a)(2)(B). Instead, petitioners contend the bond payments were "*required to be paid from former tax increment revenue*" within the meaning of subdivision (a)(2)(C) and therefore the city as successor is entitled to use the fund to make the bond payments under *that* subdivision. And they contend the city as successor is entitled to use the fund under subdivision (a)(2)(C) *before* resorting to the lease payments, contrary to the trial court's conclusion.

For its part, the department contends petitioners' reliance on subdivision (a)(2)(C) is "totally misplaced" because that subdivision "does not apply unless the Indenture imposes a binding obligation on the Successor Agency to make Bond Payments from Tax Revenues," and here the indenture does not do so.

We agree with the department that petitioners' reliance on subdivision (a)(2)(C) is misplaced, but not for the same reason the department argues. Under subdivision (a)(2)(B) of section 34183, moneys in the fund can be allocated to a successor agency for "[p]ayments scheduled to be made on revenue bonds" if two conditions are satisfied: first, "only to the extent the revenues pledged for them are insufficient to make the payments," and second, "only if the agency's tax increment revenues were also pledged for the repayment of the bonds." Unless both of these conditions are satisfied, the successor agency is not entitled to use the fund for the bond payments under the plain terms of subdivision (a)(2)(B) of section 34183. More important, though, for present purposes, is that if the conditions in subdivision (a)(2)(B) are not satisfied, then the successor agency has no right under subdivision (a)(2)(C) of section 34183 to access the fund to make the revenue bond payments disqualified under subdivision (a)(2)(B). This is so because, by its plain terms, subdivision (a)(2)(C) applies

10

only to "[p]ayments scheduled for *other* debts and obligations listed in the Recognized Obligation Payment Schedule that are required to be paid from former tax increment revenue." (Italics added.) That is, subdivision (a)(2)(C) speaks to debts and obligations *other* than those already mentioned in subdivision (a)(2)(A) and (a)(2)(B) of the statute -- specifically, "[d]ebt service payments scheduled to be made for tax allocation bonds" and "[p]ayments scheduled to be made on revenue bonds."[3]

When the statute is thus properly understood, it is evident that it *does not matter* whether the bond payments were "required to be paid from former tax increment revenue" within the meaning of subdivision (a)(2)(C) -- which is petitioners' main argument in this appeal. Because the bond payments qualified as "[p]ayments scheduled to be made on revenue bonds," the city as successor was entitled to money from the fund to make those payments, if at all, *only* pursuant to subdivision (a)(2)(B) and *only* if the conditions in that subdivision were met. In other words, because the debts or obligations at issue here are payments scheduled to be made on revenue bonds, they fall within the express purview of subdivision (a)(2)(B) and thus do not qualify as "other" debts or obligations that may fall within the purview of subdivision (a)(2)(C), even *if* they were required to be paid from former tax increment revenue. Thus, all of petitioners' arguments regarding subdivision (a)(2)(C) are misplaced.

This conclusion requires us to address two further arguments. First, petitioners contend that if the city's lease payments are viewed as the primary repayment source for the bond debt -- which is the result of interpreting section 34183 as precluding the use of the fund for that purpose because tax increment was not pledged for the repayment of the bonds -- a violation of California's constitutional debt limit (Cal. Const., art. XVI, § 18) results. Petitioners acknowledge that the deal, as originally structured, did "not violate

---

[3] We understand this to be the position the department took in its initial rejection of the city as successor's ROP statements.

11

the Constitutional Debt Limit because the City's long-term general fund obligation is in the form of a lease (or sublease) payment that is exempt from Art[icle] XVI, [section] 18(a) under" what petitioners call the "*Offner-Dean* rule."[4]  Nonetheless, petitioners argue that "if the City Lease Payments are placed in 'first' position for payment of the Bond Debt, the protections of the *Offner-Dean* rule are erased."  (Underlining omitted.)

We disagree.  As we have previously noted, the law provides that a successor agency "is a separate public entity from the public agency that provides for its governance and the two entities shall not merge" and "[t]he liabilities of the former redevelopment agency shall not be transferred to the sponsoring entity and the assets shall not become assets of the sponsoring entity."  (§ 34173, subd. (g).)  Furthermore, "[t]he liability of any successor agency, acting pursuant to the powers granted under the act adding this part, shall be limited to the extent of the total sum of property tax revenues it receives pursuant to this part and the value of assets transferred to it as a successor agency for a dissolved redevelopment agency."  (*Id.*, subd. (e).)  Because the city and its general fund are insulated from direct liability for the bond debt under the provisions of section 34173, and the only liability of the city (as opposed to the city as successor, a separate public entity) is under the terms of the lease, which petitioners admit does not violate the constitutional debt limit, that limit does not affect our decision that the city as successor is not entitled under section 34183 to use the fund to make the bond payments.

The second argument relates to the proper relief in this case.  Our determination that subdivision (a)(2)(C) does not apply to payments on revenue bonds necessarily compels us to reject petitioners' claim that the trial court erred in determining that the city as successor is entitled to use the fund under that subdivision only to the extent the city's lease payments are insufficient for that purpose.  Because subdivision (a)(2)(C)

---

[4]     See *City of Los Angeles v. Offner* (1942) 19 Cal.2d 483; *Dean v. Kuchel* (1950) 35 Cal.2d 444.

does not apply to payments on revenue bonds, the city as successor is not entitled to use the fund *at all* under that subdivision for the bond payments. This conclusion suggests that reversal of the trial court's judgment would be the appropriate disposition, rather than the affirmance that usually would follow the rejection of an appellant's arguments.

To that end, in its respondent's brief, the department urges us to reverse those portions of the trial court's judgment that conclude the city as successor is entitled to use the fund under subdivision (a)(2)(C) to the extent the city's lease payments are insufficient. The department acknowledges that it did not cross-appeal from the judgment, but argues that we may reverse nonetheless because the erroneous portions of the judgment are "interwoven with the issues raised on Santa Maria's appeal."

In their reply brief, petitioners urge us to reject the department's request for reversal because "a respondent who does not file a cross-appeal cannot assert error or seek relief."

The applicable rule can be found in *In re Marriage of Garrity & Bishton* (1986) 181 Cal.App.3d 675, 690, where the court wrote as follows:

"As a general rule, a judgment becomes final against a nonappealing party even though reversed on the appeal of another party. However such a rule does not apply 'where portions of the judgment adverse to a nonappealing party are so interwoven with the whole that appeal from a part affects the other parts; in such a situation, the appellate court can reverse the entire judgment if it is necessary to do justice.' [Citations.] 'The test of whether a portion of a judgment appealed from is so interwoven with its other provisions as to preclude an independent examination of the part challenged by the appellant is whether the matters or issues embraced therein are the same as, or interdependent upon, the matters or issues which have not been attacked. (Cites omitted.)

13

". . . [T]he judgment is severable when the original determination of those issues by the trial court and reflected in the judgment or any determination which could be made as the result of an appeal cannot affect the determination of the remaining issues of the suit . . . ."  (Cite omitted.)' "

Here, the issue raised by petitioners' appeal was whether the trial court properly interpreted and applied subdivision (a)(2)(C) of section 34183 to the facts of this case. We have concluded that the court did not do so, but our conclusion in that regard actually turns out to favor the department rather than petitioners.  We cannot do justice here by determining, as we have, that subdivision (a)(2)(C) does not apply to payments on revenue bonds and yet upholding a trial court judgment that concludes otherwise.  It is not a question of whether the department did or did not cross-appeal from the judgment. It is a question of properly interpreting the law and applying that interpretation to properly dispose of the matter before us.  Here, that requires us to reverse the judgment, even though the department did not cross-appeal.

In summary, we conclude the trial court erred in its interpretation of section 34183.  Because tax increment revenues were not pledged for the repayment of the bonds at issue here, the city as successor is not entitled to use the fund to make payments on those bonds, whether the city's lease payments are insufficient for that purpose.  Accordingly, the trial court erred in granting petitioners relief on their petition and complaint.  The proper disposition of this action is a judgment in favor of the department.

DISPOSITION

The judgment is reversed, and the case is remanded to the trial court with directions to enter a new and different judgment in favor of the director.  The department shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)


/s/
Robie, Acting P. J.


We concur:


/s/
Murray, J.


/s/
Hoch, J.


15