[Nos. G025653, G028299. Fourth Dist., Div. Three. Dec. 24, 2002.]

In re the Marriage of PAT J. and BRUCE D. ROSEN.
PAT J. ROSEN, Respondent, v.
BRUCE D. ROSEN, Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to rules 976(b) and 976.1 of the California Rules of Court, the opinion is ordered published except for part V (including subparts A, B, and C) of the section entitled "The First Appeal," all of the section entitled "The Second Appeal," and all of the section entitled "Attorney Fees on Appeal."

COUNSEL

Law Offices of Bruce Daniel Rosen, Bruce Daniel Rosen; and Richard A. Rosen for Appellant.

Patrick A. McCall for Respondent.

OPINION

FYBEL, J.—Bruce D. Rosen and Pat J. Rosen were married in September 1984. (To avoid confusion, we refer to the parties by their first names; *In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475, fn. 1 [274 Cal.Rptr. 911].) Pat filed a petition for dissolution of the marriage in October 1996. Their marriage produced two children, who are minors.

After a bench trial, the trial court issued a "*Court Order* After Trial on Reserved Issues" (the Order) that resolved issues regarding visitation rights, spousal support, child support, property division, sanctions, and attorney fees. In appeal No. G025653 (the First Appeal), Bruce challenges portions of the Order, contending the trial court erred by (1) assigning a goodwill value of $42,500 to Bruce's law practice, (2) awarding spousal support of $2,500 per month and child support of $830 per month, (3) valuing one of the two marital automobiles at substantially less than the median Kelly Blue Book value, (4) failing to credit him for debt service paid on a community debt, (5) denying his requests for sanctions, and (6) awarding Pat $10,000 in attorney fees pursuant to Family Code sections 2030 and 2032.

After entry of the Order, Pat's former trial counsel moved pursuant to *In re Marriage of Borson* (1974) 37 Cal.App.3d 632 [112 Cal.Rptr. 432] (*Borson*) for an order to set his fees and to have Bruce pay them. The trial court awarded fees of $10,725, of which the court ordered Bruce to pay $5,000 and ordered Pat to pay the balance. In appeal No. G028299 (the Second Appeal), Bruce argues the trial court abused its discretion in ordering him to pay those attorney fees. The two appeals have been consolidated.

In the First Appeal, we reverse and conclude:

1. The trial court's finding that Bruce's law practice has a goodwill value of $42,500 is erroneous. On remand, Bruce's law practice shall be assigned a goodwill value of zero.

2. The trial court's award of spousal support of $2,500 per month and child support of $830 per month is erroneous because it is based upon an

erroneous finding of Bruce's cash flow and ability to pay. The award of spousal support and child support must be recalculated as directed below.

3. The trial court's valuation of the vehicles is not erroneous.

4. The trial court erred by failing to credit Bruce for $3,913 in debt service paid on a community debt. On remand, the amount of $3,913 must be credited to Bruce in the final distribution.

5. Bruce's requests for sanctions regarding the litigation and settlement conduct of Pat's counsel might have merit. On remand, the trial court must reconsider those sanctions requests. As set forth below, Pat or her attorney is invited to respond to allegations supporting the requests for sanctions. However, the order denying Bruce's request for sanctions with respect to the closing argument briefs is not erroneous.

6. The trial court abused its discretion in ordering Bruce to pay $10,000 of Pat's attorney fees pursuant to Family Code sections 2030 and 2032. This award of attorney fees is erroneous and must be reconsidered as set forth below.

In the Second Appeal, we conclude: The trial court abused its discretion in ordering Bruce to pay $5,000 in attorney fees pursuant to *Borson, supra,* 37 Cal.App.3d 632, because Pat's attorney sought to recover fees for work never performed and for work the trial court directed him to exclude from the *Borson* fee request. The order directing Bruce to pay $5,000 in Pat's attorney fees pursuant to *Borson* is therefore reversed.

Pat has requested an award of attorney fees on appeal pursuant to Family Code sections 2030 and 2032. We deny the request without prejudice to allow the trial court after remand to determine the issue of attorney fees incurred in the appeal.

## FACTS AND PROCEEDINGS BELOW

Pat filed a petition for dissolution of the marriage on October 9, 1996. In the accompanying income and expense declaration, Pat identified her occupation as homemaker and her highest year of education completed as 16. She alleged monthly marital expenses of $12,898. Two years later, Pat filed another income and expense declaration in which she alleged monthly marital expenses of $14,173.

Bruce is a self-employed attorney. His law practice is limited almost exclusively to criminal appeals funded by the State of California. He works

out of his home. He does not earn a salary. The State of California pays Bruce a fixed hourly rate of $65 per hour ($75 per hour where the underlying crime is murder in any degree). Bruce's income fluctuates. In his income and expense declaration filed December 31, 1996, Bruce reported an average monthly gross income of $13,361.24 for the period of October 1995 through September 1996. He stated on the declaration, "my income varies from month to month." Bruce identified monthly marital expenses of $10,512.89 per month.

In a declaration filed May 16, 1997, Bruce alleged his average postseparation gross income was $11,232.88 per month. In another income and expense declaration filed October 7, 1998, Bruce alleged his average gross monthly income was $8,771.73 for the preceding 12 months. In a later income and expense declaration filed January 7, 1999, Bruce alleged his average gross monthly income was $7,695.04 for the preceding 12 months.

Issues of custody and visitation were bifurcated and tried first. The court awarded joint legal custody of the children with Bruce having primary physical custody. A judgment on the bifurcated issues of custody and visitation granted Bruce primary custody and Pat secondary custody according to a schedule set forth in the judgment.

A trial on issues of support and property division was held on October 7, 1998, and January 7 and 13, 1999. On April 28, 1999, the trial court issued the Order, which resolved the issues tried and awarded Pat $10,000 in attorney fees.

Bruce requested attorney fees or sanctions against Pat and/or her attorney, Patrick A. McCall, on three occasions. On October 7, 1998, Bruce filed a request for attorney fees "in the nature of a sanctions pursuant to Family Code section 271" (the first sanctions request) based upon McCall's conduct which Bruce contended "frustrated the law's policy of promoting settlement and promoting cooperation . . . ." On December 10, 1998, Bruce filed a supplemental request for sanctions (the second sanctions request) seeking sanctions against McCall on the ground he allegedly lied to the court. On February 10, 1999, Bruce filed a third request for sanctions (the third sanctions request), contending Pat's closing argument brief included numerous instances of improper argument. In the third sanctions request, Bruce sought $37,000 in sanctions ($1,000 for each supposedly improper argument), but increased the amount sought to $63,000—an additional $1,000 for each supposedly improper argument McCall made in opposition to the third request for sanctions. In the Order, the court denied all three sanctions requests.

After the trial court denied Bruce's motion for a new trial, Bruce timely appealed from the Order.

On December 3, 1999, McCall filed a motion to recover attorney fees pursuant to *Borson, supra,* 37 Cal.App.3d 632. He later supplemented the motion with billing statements reflecting $10,725 in fees incurred since June 30, 1999. Bruce opposed and sought sanctions against McCall. In an order entered October 5, 2000, the trial court ordered Bruce to pay McCall $5,000 in attorney fees and ordered Pat to pay the balance. The court denied Bruce's request for sanctions. Bruce timely appealed from "the portion" of that order "requiring [Bruce] to pay $5,000.00 in additional attorney fees."

In May 2002, we granted McCall's motion to partially dismiss the Second Appeal and construed Bruce's notice of appeal "as from the order on October 5, 2000 requiring [Bruce] to pay additional attorney fees, not from the portions of the same order denying [Bruce's] request for sanctions." In the same order we ruled that Pat's request for attorney fees on appeal would be decided in conjunction with the decision on the merits of the appeal.

## THE FIRST APPEAL

### I. *Goodwill Value of Bruce's Law Practice*

The trial court determined Bruce's law practice to be worth $60,500, of which the court determined $42,000 to constitute goodwill under an "excess earnings" calculation. In determining the value of goodwill, the trial court found: "[Bruce] has one secretary that he pays $10.00 per hour. His business has an average cash flow of $162,000.00 per year and he could hire an attorney to do his activity for approximately $100,000.00 per year. There is approximately $42,000.00 per year in 'excess earnings' for his business. This Court finds that the community value in his business is $60,500.00."

Bruce asserts his law practice has no goodwill value. He argues the trial court's determination of goodwill results from a misapplication of the excess earnings method for calculating goodwill. We agree.

### A. *The Excess Earnings Method of Valuing Goodwill*

**(1a)** "In determining the value of a law practice or interest therein, the trial court should determine the existence and value of . . . goodwill of the practitioner in his law business as a going concern . . . ." (*In re Marriage of Lopez* (1974) 38 Cal.App.3d 93, 110 [113 Cal.Rptr. 58]; accord, *In re Marriage of Kilbourne* (1991) 232 Cal.App.3d 1518, 1522 [284 Cal.Rptr.

201]; *In re Marriage of Garrity and Bishton* (1986) 181 Cal.App.3d 675, 688-689 [226 Cal.Rptr. 485].) A law practice's goodwill is an asset that must be valued and factored into the community property division. (*In re Marriage of Lopez, supra,* 38 Cal.App.3d at pp. 107-108; *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 673, fn. 4 [33 Cal.Rptr.2d 13].)

■ The courts have not established an unvarying rule for determining the existence or value of a law practice's goodwill for purposes of a marital dissolution (*In re Marriage of Lopez, supra,* 38 Cal.App.3d at p. 109), and, as one treatise notes, "[c]oncededly, 'capitalization of the excess earnings' method may be adopted." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2002) ¶ 8:1445 (rev. # 1, 2002).) ■ The " 'excess earnings' " method focuses on the " 'earning power' " of the business to determine what " 'rate of return' " the predicted earnings will yield in light of the risks involved to attain them. (*Id.,* ¶ 8:1422 (rev. # 1, 2000).)

In *In re Marriage of Garrity and Bishton, supra,* 181 Cal.App.3d at page 688, footnote 14, the court explained the excess earnings method as follows: "Pursuant to this method, one first determines a practitioner's average annual net earnings (before income taxes) by reference to any period that seems reasonably illustrative of the current rate of earnings. One then determines the annual salary of a typical salaried employee who has had experience commensurate with the spouse who is the sole practitioner or sole owner/employee. Next, one deducts from the average net pretax earnings of the business or practice a 'fair return' on the net tangible assets used by the business. Then, one determines the 'excess earnings' by subtracting the annual salary of the average salaried person from the average net pretax earning of the business or practice remaining after deducting a fair return on tangible assets. Finally, one capitalizes the excess earnings over a period of years by multiplying it by a factor equal to a specific period of years, discounted to reflect present value of the excess earnings over that period. The period varies according to factors such as the type of business, its stability, and its earnings trend."

A treatise criticizes the excess earnings method as described in *In re Marriage of Garrity and Bishton, supra,* 181 Cal.App.3d 675, as being "predicated on several erroneous statements" and recommends the method "*not be relied on in practice.*" (Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* ¶ 8:1445.) The treatise does not identify those erroneous statements or what method should be relied upon in practice, and therefore provides us no basis to vary from the excess earnings method described in *In re Marriage of Garrity and Bishton.* Amicus curiae California Society of Certified Public Accountants in its petition for rehearing, modification, or

depublication (petition) identified an omission in the excess earnings method described in *In re Marriage of Garrity and Bishton,* but our decision remains the same after considering the corrected analysis.

█ The excess earnings method is not the only measure of goodwill value. Goodwill value may be measured by "any legitimate method of evaluation that measures its present value by taking into account some past result," so long as the evidence "legitimately establishes value." (*In re Marriage of Foster* (1974) 42 Cal.App.3d 577, 584 [117 Cal.Rptr. 49].) █ Pat's expert used the excess earnings method to measure the goodwill of Bruce's law practice, even though he testified he had not read *In re Marriage of Garrity and Bishton.* Bruce agrees the excess earnings method as described in that case is the correct method to use. Accordingly, we first analyze whether the evidence supports the trial court's finding of goodwill value under the excess earnings method as described in *In re Marriage of Garrity and Bishton.*

B. *The Trial Court Misapplied the Excess Earnings Method.*

At trial, the evidence of goodwill consisted of the testimony and report of Pat's expert. Bruce did not present a rebuttal expert. Pat's expert concluded Bruce's law practice had a value of $60,500 as of August 30, 1996. Of that amount, the expert assigned $42,000 to goodwill, using an excess earnings approach. The remaining $18,500 reflected owner's equity.

To calculate goodwill using an excess earnings approach, Pat's expert started with Bruce's 1995 net income of $139,610 and then added back depreciation of $4,369 to reach a subtotal of $143,979. From that figure, the expert subtracted return on net worth of $1,850. That amount was calculated by applying a return rate of 10 percent to net worth of $18,500 (the amount assigned to owner's equity). The expert then subtracted $100,000, which, in his opinion, would be "reasonable compensation" for someone doing Bruce's work. The expert applied a capitalization rate of 1 to the remainder to reach a goodwill value of $42,000. The trial court accepted that figure.

Bruce contends the goodwill amount determined by the expert and adopted by the trial court is incorrect under *In re Marriage of Garrity and Bishton, supra,* 181 Cal.App.3d 675, because (1) Pat's expert failed to use an average of Bruce's net income, and (2) Pat's expert failed to use the "annual salary of the average salaried person" (*id.* at p. 688, fn. 14).

1. *Failure to Use an Average of Bruce's Net Income for Determining Goodwill Value.*

Pat's expert testified he considered Bruce's net income for 1992, 1993, and 1994 (as reflected on Bruce's federal income tax forms) but decided to

use only net income for 1995 in calculating excess earnings. Pat's expert also relied upon a cash flow report for the first eight months of 1996, which showed an income for Bruce of about $13,500 per month. The expert chose to use net income from 1995, rather than an average of the years 1992-1995, but admitted he "possibly . . . should have averaged it." The expert conceded if he had used an average of Bruce's earnings over any period of years, rather than Bruce's net income for 1995, he would have concluded there either were nominal or no excess earnings, and, hence, little or no goodwill value.

Under the facts presented here, we believe Pat's expert "should have averaged it." The excess earnings method described in *In re Marriage of Garrity and Bishton* requires that one first determines "a practitioner's *average* annual net earnings (before income taxes) by reference to any period that seems reasonably illustrative of the current rate of earnings." (*In re Marriage of Garrity and Bishton, supra,* 181 Cal.App.3d at p. 688, fn. 14, italics added.) The evidence showed Bruce's net income was volatile. The expert's own report shows Bruce to have had net income in 1992 of $72,667, in 1993 of $101,067, and in 1994 of $71,362. Bruce's net income for 1995 alone is neither an average nor "reasonably illustrative" of his earnings. A reasonable trier of fact could not help but conclude the expert chose to use Bruce's net income from 1995—one of Bruce's highest earning years— solely to inflate the value of goodwill.

Pat argues her expert's analysis is justified because Bruce's annual income for the years 1988 through August 1996 was $162,270.25 per year. The trial court found that Bruce's business "has an average cash flow of $162,000.00 per year . . . ." That amount is Bruce's average *gross income* for those years. The excess earnings method requires use of *net* income.

Pat contends Bruce never offered his own expert to rebut her expert's conclusions. True, but the fact the expert's testimony was not contradicted by other expert testimony does not make it conclusive on the trial court or on us. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631-632 [85 Cal.Rptr.2d 386] [uncontradicted expert testimony only conclusive on issue of standard of care in professional negligence cases].)

Further, it is obvious that using one year's net income (not coincidentally a high-income year) is not illustrative of Bruce's volatile income over a period of several years. We could not express the principle better than this: "The correct rule on the necessity of expert testimony has been summarized by Bob Dylan: 'You don't need a weatherman to know which way the wind blows.' The California courts, although in harmony, express the rule somewhat less colorfully and hold expert testimony is not required where a

question is 'resolvable by common knowledge.' [Citations.]" (*Jorgensen v. Beach 'N' Bay Realty, Inc.* (1981) 125 Cal.App.3d 155, 163 [177 Cal.Rptr. 882], fn. omitted.) Picking one year's net income, where income rises or falls from year to year, is not a reasonable basis for determining value.

Pat argues that under *In re Marriage of Garrity and Bishton, supra,* 181 Cal.App.3d 675, the trial court was not bound to use any particular time period over which to average income for calculating goodwill. The problem is that Bruce's net income for 1995 alone is not illustrative of Bruce's rate of earnings in light of the fluctuations in Bruce's income. Pat's expert admitted that had he averaged Bruce's income over *any* period of years he considered, goodwill value would be nominal or nothing.

Pat also argues Bruce was given the opportunity to provide his current income to her expert, "but he refused to cooperate." Bruce's income after the Rosens separated in August 1996 is irrelevant for valuing goodwill because Bruce's law practice must be valued as of the date of separation, not the date of trial. (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 624-626 [108 Cal.Rptr.2d 833].)

Pat suggests the trial court's determination of goodwill value must stand, regardless of any flaws in the expert's testimony, because "courts are not limited to any one method of measuring its value." As we explained above (*ante,* p. 819), courts are not limited to using the excess earnings method to measure goodwill. (*In re Marriage of Foster, supra,* 42 Cal.App.3d at p. 584.) But "the evidence must be such as legitimately establishes value." (*Id.* at p. 583.) The excess earnings analysis of Pat's expert did not *legitimately* establish value under the excess earnings method, and he did not opine on value under any other method.

We conclude the trial court's finding of the goodwill value of Bruce's law practice is erroneous. Under the facts presented in this case, the expert should have averaged Bruce's net earnings. The expert conceded if he had done so for any period of relevant years he would have concluded there was little or no goodwill value. On remand, the court must assign a goodwill value of zero to Bruce's law practice in the final distribution.

*2. Erroneous Determination of "Reasonable Compensation" for a Replacement Attorney.*

Our conclusion the trial court should have used an average of Bruce's net income is sufficient to conclude the trial court's finding of the amount of goodwill is erroneous. But we also agree with Bruce that the

testimony of Pat's expert regarding "reasonable compensation" is conjecture and could not be used in forming an expert's opinion of goodwill value.

Pat's expert testified he did not have any particular knowledge of lawyer compensation, other than what he had learned from valuations he had performed. He admitted he was not familiar with a law practice like Bruce's. He did not conduct a survey or perform any kind of study of lawyer compensation in Southern California. Rather, he relied entirely upon two surveys of compensation (the Altman Weil survey and the Robert Morris survey), neither of which dealt with a sole practitioner lawyer handling state-funded criminal appeals. The expert did not attempt to relate the information in the surveys to an analysis of Bruce's law practice.

From these surveys, Pat's expert came up with a conclusion, based on his "judgment," that reasonable compensation for a replacement attorney would be $100,000. The expert testified he "did a rough average of the numbers, but it wasn't an exact average, and then concluded that, based on that hourly rate, approximately, and based on the survey, looking at the range, a hundred thousand dollars appeared to be a reasonable number, if you look at the . . . $125,000 range to the $67,000 range, the middle of that is approximately a hundred thousand dollars also. So I looked . . . at it a number of different ways, to estimate a hundred thousand dollars."

Pat's expert might just as well have plucked the $100,000 figure from thin air. We do not disapprove of compensation surveys as a general matter. We realize they can be useful when used properly. But we question whether a *national* survey of lawyer compensation (such as the Altman Weil survey) is a proper basis for offering an opinion on average lawyer compensation in *Southern California*. (See Evid. Code, § 801, subd. (b).) We also question whether the Altman Weil survey is applicable to Bruce's law practice, which consists almost exclusively of handling state-funded criminal appeals. The expert, though, did not hold himself to the compensation figures in the Altman Weil survey, but turned to another survey—the Robert Morris survey—purporting to show average compensation for officers and directors of various kinds of businesses. We believe the Robert Morris survey is inapplicable to a sole practitioner lawyer, such as Bruce, who does not have officers or directors. Pat's expert then used his own "judgment" to come up with a compensation figure based upon the numbers in these two surveys, even though he admitted he did not have any particular knowledge about lawyer compensation and did not know of any attorney with a law practice like Bruce's. In essence, Pat's expert did nothing more than pick $100,000 because it was about halfway between $125,000 and $67,000. Those two numbers bear no particular materiality to the issue of reasonable compensation in this case.

Amicus curiae California Society of Certified Public Accountants (Cal-CPA) explains in its petition that the "annual salary of the average salaried person" standard of *In re Marriage of Garrity and Bishton* is not the only standard for establishing reasonable compensation under the excess earnings method. Amicus curiae explains reasonable compensation may also be based upon " 'the cost of hiring a nonowner outsider to perform the same average amount that other people are normally compensated for performing similar services' "—the "similarly situated professional" standard. Expert testimony, amicus curiae argues, would be helpful in determining which approach (the "average salaried person" or the "similarly situated professional") is appropriate under the facts of a case and in applying the relevant approach to determine reasonable compensation. We agree with amicus curiae and appreciate its contribution and interest in this matter.

Our concern is that the surveys relied upon by Pat's expert were not relevant to Bruce's law practice and therefore were not useful in establishing compensation under either the "average salaried person" standard of *In re Marriage of Garrity and Bishton* or the "similarly situated professional" standard. We are also troubled by the fact that Pat's expert ultimately reached his determination of compensation by exercising his "judgment" when the expert admitted he did not have any knowledge of a law practice like Bruce's.

After considering the correction to the excess earnings analysis pointed out by amicus curiae, our conclusion remains that Bruce's law practice must be given a goodwill value of zero. This conclusion is consistent with the position of amicus curiae in its petition: "The Court's criticism in the *Rosen* opinion of the expert's manner of valuing goodwill is well founded. Both the Family Law and Business Valuation Sections [of CalCPA] believe there is substantial support for reversal of the trial judge and a finding of no goodwill."

## II. *Amount of Spousal Support and Child Support*

The trial court found Bruce's cash flow to be $13,500 per month "at this time" and used that figure to set spousal support at $2,500 per month and child support at $830 per month. Bruce contends the trial court erred in setting those amounts of spousal support and child support because (1) the evidence did not support the finding his cash flow was $13,500 per month "at this time," (2) the trial court based spousal support upon the marital standard of living rather than Pat's current living expenses, and (3) the trial court calculated child support based upon an incorrect calculation of Pat's custody time with the children. We address each contention in turn.

## A. *Bruce's Cash Flow*

In setting spousal support, the court must consider various circumstances, including "[t]he ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living." (Fam. Code, § 4320, subd. (c); see also *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 302-304 [111 Cal.Rptr.2d 755].) The supporting spouse's ability to pay is "a key factor" in setting spousal support. (*In re Marriage of Cheriton, supra,* 92 Cal.App.4th at p. 304.)

The trial court set spousal support based upon a finding that Bruce's cash flow "*at this time*" is $162,000 per year or $13,500 per month. (Italics added.) The trial court found Bruce "earns a salary of $13,500.00 per month before taxes," even though it was undisputed Bruce was a self-employed attorney and his income fluctuated. The court based its income finding upon trial exhibits and the expert's testimony showing Bruce's cash flow as of *1996,* two years before trial in January 1999. Bruce argues the court erred in basing spousal support upon his cash flow as of 1996. He is correct.

The trial court based spousal support upon Bruce's cash flow as of the end of 1996 because "[Bruce] offered no records for any periods of time since 1996." That is not correct. Bruce testified his gross income for 1998 was $92,330. Bruce's income and expense declaration (filed Jan. 7, 1999) reflects a gross income of $92,340.50 during the previous 12 months, or $7,695.04 per month. This declaration alone was sufficient to establish Bruce's current income. (*In re Marriage of McQuoid* (1991) 9 Cal.App.4th 1353, 1359 [12 Cal.Rptr.2d 737].) At trial, Bruce testified the information in the income and expense declaration was correct. Bruce also submitted as exhibit 1 his federal income tax return for 1998 confirming his testimony regarding the amount of his income for that year.

The trial court decided "[i]f the income went down he should have provided appropriate documents to [Pat's] expert or brought his own expert to the court. He chose to do neither." However, Bruce was obligated to do neither. We fail to see how Bruce had any obligation to cooperate with his adversary's expert witness. Bruce was not obligated to drive up the cost of litigation by retaining an expert witness to testify as to his own income. Bruce knew his own income; expert testimony was not necessary and possibly not even permissible. (*Jorgensen v. Beach 'N' Bay Realty, Inc., supra,* 125 Cal.App.3d at p. 163; see also *Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1102 [109 Cal.Rptr.2d 583] [rejecting

argument that plaintiff had to produce expert testimony to prove nonconformity caused oil leak in automobile].)

Earning capacity may be used to determine the amount of spousal support (Fam. Code, § 4320, subd. (c)), but the trial court did not make a finding as to Bruce's earning capacity. Rather, the trial court found Bruce's *actual* income *at this time* to be $13,500. Further, earning capacity usually is considered in setting spousal support only where the record shows the supporting spouse has deliberately attempted to avoid family financial responsibilities. (*In re Marriage of Simpson* (1992) 4 Cal.4th 225, 232 [14 Cal.Rptr.2d 411, 841 P.2d 931].) Pat did not make such a claim.

■ The trial court's determination of spousal support and child support is reviewed for abuse of discretion, but " 'discretion must be exercised along legal lines, taking into consideration the circumstances of the parties, their necessities and the financial ability of the [supporting spouse.]' " (*In re Marriage of Laube* (1988) 204 Cal.App.3d 1222, 1225 [251 Cal.Rptr. 745].) ■ Here, the trial court abused its discretion because it based spousal support upon the erroneous finding that Bruce's income at the time of trial was $13,500 per month. We therefore conclude that portion of the Order setting spousal support and child support is erroneous and remand with directions to recalculate spousal support and child support as explained in part II.D, below.

B. *The Marital Standard of Living*

■ In ordering spousal support, the trial court must consider "[t]he needs of each party based on the standard of living established during the marriage." (Fam. Code, § 4320, subd. (d).) " 'Spousal support must be determined according to the needs of both parties and their respective abilities to meet these needs. . . .' " (*In re Marriage of Meegan* (1992) 11 Cal.App.4th 156, 161 [13 Cal.Rptr.2d 799].)

The trial court must make "specific factual findings with respect to the standard of living during the marriage," regardless whether findings are requested. (Fam. Code, § 4332.) Here, the trial court found, "[t]he life style at the time of separation was 'upper-middle class'; the parties lived in a house in a quiet neighborhood near the ocean in Dana Point; they had two cars; they were able to travel; the wife was able to buy clothes when she needed them and the parties were able to take vacations all with only the husband's income . . . ." The trial court also found "[t]he needs of [Pat] as shown on the Income and Expense form filed October 7th, 1998 are found by this court to be a total at this time of $4,000.00 per month." The court

stated it intended to meet Pat's basic needs "at this time," but "the 'needs' that would allow her to live the same life style as of the date of separation will still not be met at this time."

Bruce challenges these findings on several grounds, one of which has merit. Bruce argues the amount of spousal support does not correctly reflect his ability to pay. Spousal support must be established according to the needs of both parties and " 'their respective abilities to meet these needs. . . .' " (*In re Marriage of Meegan, supra*, 11 Cal.App.4th at p. 161.) Although we will imply necessary findings and resolve ambiguities in support of the Order, the findings—express or implied—must be supported by substantial evidence. In setting spousal support, the trial court found that Bruce "earns a salary of $13,500.00 per month before taxes." No evidence supported this finding. As explained above, the evidence showed Bruce is a self-employed attorney whose practice consists almost exclusively of handling state-funded criminal appeals. He earns no salary; his income fluctuates from year to year. Bruce's gross income for 1998 was $92,340.50, which is $7,695.04 per month. The amount of spousal support and child support set forth in the Order is based upon an unsupported finding of Bruce's ability to pay and therefore is erroneous.

### C. *Percentage of Time Pat Has Custody of the Children*

Bruce contends the trial court based child support upon an incorrect calculation of the amount of time Pat has custody of the children. In calculating child support, the trial court found Pat has custody 30 percent of the time. Bruce contends Pat has custody only 25.20 percent based upon the custody and visitation order. He contends the amount of child support must be adjusted accordingly.

We have independently calculated the number of hours of custody in both odd and even years based upon the "Judgment on Bifurcated Issue of Custody and Visitation." In making this calculation, we have assumed a seven-hour school day and a December vacation two weeks in length, with each parent having custody for one of those weeks.

With those assumptions, we have calculated that Pat has custody for 2,713 hours in odd years and 2,710 hours in even years. This amounts to 30.97 percent in odd years and 30.93 percent in even years. There might be some overlap between Pat's weekend custody and holidays that could reduce that percentage to 30 percent, the amount used by the court. The trial court therefore did not err in calculating child support based upon a finding that Pat has custody 30 percent of the time.

D. *Conclusion as to Marital Support and Child Support*

The trial court's award of spousal support and child support is erroneous. On remand, the trial court must recalculate the amounts of spousal support and child support. Spousal and child support must be calculated for three time periods: (1) to January 31, 1999 (approximately the time of the first trial), (2) from January 31, 1999 to the date on which the amount of support is determined on remand, and (3) from the date on which the amount of support is determined on remand forward. For the first time period, the trial court must consider a monthly income for Bruce of $7,695.04 as of January 1999. For the second time period, the court must consider evidence of Bruce's ability to pay *during that time period*. If the resulting determinations of spousal support and child support for the first two time periods establish Bruce has made overpayments in support, then the trial court should consider whether to order reimbursement under Family Code section 3653, subdivision (c). We express no opinion as to whether or how any reimbursement should be made. For the third time period, the court must consider evidence of Bruce's ability to pay as of the date of determination of spousal support and child support on remand. Child support calculations for all the time periods should be based upon Pat having custody for 30 percent of the time, unless the joint custody order has changed. For all the time periods, the court must reconsider the marital standard of living for Pat in light of Bruce's actual ability to pay.

III. *The Value of the Automobiles*

 Two cars were part of the marital estate—a 1990 Jaguar and a 1993 Nissan Minivan. At the outset of trial, the court stated the cars would be valued at Kelly Blue Book median value at the time of trial and without accessories. Bruce established those values were $15,075 for the Jaguar and $10,012.50 for the Nissan. The outstanding loan balance on the Jaguar was about $5,975, creating a net value of $9,100.

The trial court assigned the Jaguar to Bruce at a value of $9,100 and assigned the Nissan to Pat, but at a value of $5,100. The court charged the difference of $4,000 to Bruce's side of the balance sheet. The court considered the "deferred maintenance on the various vehicles in computing the present actual value as well as the testimony of the parties as to the value of the vehicle driven by them."

We find no error in the trial court's valuation of the vehicles. We disagree with Bruce's contention that the trial court was bound by its statement at the

outset of trial that it would assign the cars the median Kelly Blue Book value at the time of trial. After the court expressed its intent to use the Kelly Blue Book value, Pat's counsel stated, "The only exception we have, your Honor, is if the court's willing to entertain it, [Pat's] prepared to testify that the vehicle that she's operating has significant transportation problems, or transmission problems." The court allowed Pat to present this testimony.

Pat testified the Nissan had transmission problems, the sunroof was inoperable and leaked, and had electrical problems. Pat spent $1,800 to repair the transmission, and Bruce testified the Kelly Blue Book does not include the cost of the repairs. Considering the testimony of the Nissan's problems and the cost to repair the transmission, the trial court did not err in assigning the Nissan a value of $5,100.

## IV. The Chase Debt Service

■ The parties stipulated that, after separation, Bruce paid from separate property $3,913 in debt service on a loan in the principal amount of $15,000 drawn on Bruce's business line of credit (the Chase debt). Bruce contends the trial court erred by failing to give him credit for his payments on this debt service. We agree.

In *In re Marriage of Epstein* (1979) 24 Cal.3d 76, 84 [154 Cal.Rptr. 413, 592 P.2d 1165], the court held, " 'a spouse who, after separation of the parties, uses earnings or other separate funds to pay preexisting community obligations should be reimbursed therefor out of the community property upon dissolution.' " Here, the trial court found the Chase debt is a community debt because it was created during the marriage. The debt service payments on the Chase debt are also community debt, but the trial court failed to credit Bruce for them. The exceptions identified in *In re Marriage of Epstein, supra*, 24 Cal.3d 76, 84-85, do not apply here. Thus, in the final distribution, Bruce must be credited in the amount of $3,913 for debt service payments on the Chase debt.

## V. Sanctions*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VI. Attorney Fees

■ In her closing argument brief at trial, Pat claimed she had paid her attorney $3,500 and owed him "well in excess of $40,000.00" and claimed

---

*See footnote, *ante*, page 808.

she had no means to pay the fees. As noted above, the trial court directed Bruce to pay $10,000 of Pat's attorney fees pursuant to Family Code sections 2030 and 2032.

The trial court concluded that award was justified and found Bruce could pay it without hardship because (1) he makes "approximately ten (10) times as much in earnings as does [Pat]," (2) he had the proceeds ($23,057.27) from the sale of the marital home, and (3) he "testified" his "hourly rate at this time was $225.00 per hour." Therefore, the court found, "If [Bruce] only billed the State of California for 20 hours per week his total income would exceed $19,000.00 per month and the amount ordered is less than one month income."

 Family Code section 2030 permits the trial court to order payment of attorney fees and costs as between the parties based upon their "ability to pay" and their "respective incomes and needs" in order to "ensure that each party has access to legal representation to preserve all of the party's rights." (Fam. Code, § 2030, subd. (a).) "The purpose of such an award is to provide one of the parties, if necessary, with an amount adequate to properly litigate the controversy." (*In re Marriage of Duncan, supra,* 90 Cal.App.4th 617, 629.) The trial court may award attorney fees under section 2030 "where the making of the award, and the amount of the award, are just and reasonable under relative circumstances of the respective parties." (Fam. Code, § 2032, subd. (a).)

"In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in [Family Code] Section 4320." (Fam. Code, § 2032, subd. (b).) The parties' circumstances described in section 4320 " 'include assets, debts and earning ability of both parties, ability to pay, duration of the marriage, and the age and health of the parties.' " (*In re Marriage of Duncan, supra,* 90 Cal.App.4th at p. 630.) In assessing one party's need and the other's ability to pay, the court may consider evidence of the parties' current incomes, assets, and earning abilities. (*Ibid.*)

An award of attorney fees under Family Code section 2030 is reviewed for abuse of discretion, and we therefore must affirm unless no judge reasonably could make the order. (*In re Marriage of Duncan, supra,* 90 Cal.App.4th at p. 630.)

 Bruce contends the trial court's findings do not support the award of attorney fees and there was no evidence he could pay any portion of them.

Specifically, he argues he does not earn 10 times more than Pat, the sale proceeds from the home are not, standing alone, sufficient evidence of his ability to pay Pat's attorney fees, and his hourly rate is not $225 per hour. We agree. The trial court's findings are demonstrably wrong. Bruce's hourly rate is not $225 an hour—it is $65 or $75 per hour—and his income is not 10 times greater than Pat's, after considering spousal support payments. The sale proceeds from the home, as Bruce points out, are insignificant in light of his combined preseparation and postseparation debts of about $250,000.

No judge could reasonably make such findings or base an award of attorney fees on them. The trial court's order requiring Bruce to pay $10,000 of Pat's attorney fees is therefore erroneous. On remand, the court must reconsider an award of attorney fees, if any, in light of Bruce's correct income for the relevant time period. Any attorney fees awarded must be reduced by the amount of any sanctions awarded in favor of Bruce.

Bruce also argues Pat's attorney fees are too high, asserting Pat's attorney "churned a fee in excess of $40,000.00," and did not " 'wisely devote[]' " his " 'skill and effort' " to the " 'expeditious disposition of the case.' " In light of the serious billing problems and misrepresentations, which we describe below, we too are suspicious of the amount of Pat's attorney fees. On remand, each item of attorney fees, including the amount of time spent, must be justified by declaration to be recoverable.

THE SECOND APPEAL*

. . . . . . . . . . . . . . . . . . . . . . .

ATTORNEY FEES ON APPEAL*

. . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

We reverse and remand for further proceedings. To provide guidance to the trial court and the parties, we describe the disposition and directions on remand in detail:

1. The trial court's finding that Bruce's law practice has a goodwill value of $42,500 is erroneous. On remand, Bruce's law practice must be assigned a goodwill value of zero in the final distribution.

*See footnote, *ante*, page 808.

2. The trial court's award of spousal support of $2,500 per month and child support of $830 per month is erroneous. On remand, the trial court must calculate spousal support and child support for three time periods: (1) to January 31, 1999 (approximately the time of the first trial), (2) from January 31, 1999, to the date on which the amount of support is determined on remand, and (3) from the date on which the amount of support is determined on remand forward. For the first time period, the trial court must consider a monthly income for Bruce of $7,695.04 as of January 1999. For the second time period, the court must consider relevant evidence of Bruce's ability to pay (including but not limited to evidence of income) for that time period. If the resulting determinations of spousal support and child support for the first two time periods establish Bruce has made overpayments in support, then the trial court should consider whether to order reimbursement under Family Code section 3653, subdivision (c). We express no opinion as to whether or how any reimbursement should be made. For the third time period, the court must consider relevant evidence of Bruce's ability to pay (including but not limited to income) as of the date of redetermination of spousal support and child support on remand. Child support calculations for all the time periods should be based upon Pat having custody for 30 percent of the time, unless the joint custody order has changed. For all the time periods, the court must reconsider the marital standard of living for Pat in light of Bruce's actual ability to pay.

3. The trial court's valuation of the vehicles is not erroneous.

4. The trial court erred by failing to credit Bruce for $3,913 in debt service paid on a community debt. On remand, the amount of $3,913 must be credited to Bruce in the final distribution.

5. The trial court's denial of Bruce's first and second sanctions requests is erroneous. On remand, the trial court must reconsider the requests. Pat or her attorney is invited to respond to the sanctions requests. If no response is made to the first and second sanctions requests, the trial court must grant sanctions in Bruce's favor as to the subject requests. The trial court's denial of Bruce's third sanctions request is not erroneous.

6. The trial court's order requiring Bruce to pay $10,000 of Pat's attorney fees pursuant to Family Code sections 2030 and 2032 is erroneous. On remand, the trial court must reconsider an award of attorney fees, if any, in light of Bruce's correct income for the relevant time period. Any attorney fees awarded must be reduced by the amount of any sanctions awarded in favor of Bruce. On remand, every item of attorney fees, including the amount of time spent, must be justified by declaration to be recoverable.

7. The *Borson* Order is reversed in full.

8. Pat's motion for attorney fees on appeal is denied without prejudice and may be renewed in the trial court after remand. An award of attorney fees on appeal, if any, must be made after recalculation of spousal support and child support and must be based upon Bruce's and Pat's abilities to pay as of November 1999, when Pat filed the motion for attorney fees. In determining an attorney fees award, the trial court may consider the actual amount of attorney fees Pat incurred in connection with the appeal, but every item of attorney fees, including the amount of time spent, must be justified by declaration to be recoverable.

Rylaarsdam, Acting P. J., and Aronson, J., concurred.

A petition for a rehearing was denied February 19, 2003, and the opinion was modified to read as printed above.