Filed 12/11/24  Marriage of McGovern and Stoller CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re the Marriage of MARCIA McGOVERN and DAVID STOLLER. | |
| MARCIA McGOVERN,<br><br>        Appellant,<br><br>v.<br><br>DAVID STOLLER,<br><br>        Respondent. | A167459<br><br>(Marin County<br>Super. Ct. No. FL1901256) |

Marcia McGovern and David Stoller separated after a long marriage.[1] Following a trial, Marcia appeals that the permanent spousal support award is too low considering the marital standard of living and David's high income. She also contends the trial court erred in denying her request for additional attorney fees.  We affirm.

---

[1] As do the parties in their briefs, we refer to the parties by first name for clarity, intending no disrespect.

1

# FACTUAL AND PROCEDURAL BACKGROUND

## I.     *The Parties Separated*

Marcia and David married in August 1991.  David was the primary wage earner, working as a medical doctor and consultant; Marcia raised the parties' now adult child and ran the household.

The parties separated in April 2019 after 27 years 8 months of marriage.  During the pendency of the litigation, the trial court ordered David to pay Marcia $24,000 per month in temporary spousal support.  The court also ordered David to advance a total of $225,000 to Marcia for attorney fees.

The parties aggressively litigated the divorce.  But they ultimately reached a settlement on all issues except permanent spousal support, postseparation reimbursement claims, and attorney fees.  Those issues went to trial.

## II.     *The Parties Disputed the Amount Necessary to Maintain Their Marital Standard of Living*

At trial, the parties agreed on, or did not contest, most material facts.  Notably, there was no meaningful dispute that the parties enjoyed a rather comfortable standard of living during the marriage.  For instance, David's income exceeds $1 million per year, including annual stock awards.  The value of David's annual stock awards varies based on the stock's share price.  Also, David paid Marcia around $900,000 to equalize their property division, and he borrowed about $500,000 to finance the litigation.  David agreed Marcia is unable to work.  Moreover, they both own unencumbered multi-million-dollar homes as well as multiple vehicles and valuable personal property.

Significantly, David stipulated the accuracy of a portion of Marcia's expert's marital standard of living report.  That portion of the report

2

calculated the couple's average posttax income for the five-year period 2014–2018 to be $119,258.90 per month.  David asserted, however, that several income streams described in the report were "not expected to carry forward" and disputed the propriety of the report's inflation adjustment.  David also disagreed with Marcia's testimony regarding their vacations, arguing "most of [those] trips were all business-related . . . ."

Each party also submitted income and expense (I&E) declarations. David's I&E declaration listed $23,915 in monthly expenses, exclusive of installment payments servicing $1.148 million in debt, while Marcia claimed $47,482 in monthly expenses during trial, inclusive of her attorney fees and other loan payments.  She also submitted two other I&E declarations, in September 2021 and May 2022, purporting to show that her expenditures based on the marital standard of living would be $56,274 per month and $54,242 per month, respectively.  Both of those declarations included $15,000 in monthly savings and investments.

The parties principally disputed the implications of the facts.  In his closing trial brief, David objected to Marcia's mathematical calculation of the marital standard of living based on his income.  He also characterized their marital standard of living as an "artificial" result of his "extraordinary work effort," which he asserted would be "impossible" to maintain.  Given his age, equalization payments to Marcia, lack of liquidity, and diminished sources of income, David contended his "income available for support should be deemed $906,795 per year."  He further claimed Marcia could be self-supporting, pointing to her social security benefits and cash and retirement assets. Relying on Marcia's I&E declaration of her current expenses, David noted that Marcia's monthly expenses were around $19,000 excluding her attorney fees.  Based on this and the applicable statutory factors governing spousal

3

support, David requested that the trial court set permanent spousal support at $15,000 per month plus 17.25 percent of his income above $909,000.

In contrast, Marcia took a more quantitative perspective of the parties' marital standard of living, emphasizing a "benchmark" support award of "approximately 40% of the supporting spouse's available after-tax income." She noted David's only objection to her expert's marital standard of living report was its inflation adjustment, and she pointed out "[h]e did not testify about any specific plans to retire in the near future." She asserted that David's requested support amount was inequitable given his income and too little given her marital standard of living. Specifically, she claimed it would leave her "a mere 30.9% of [David's] available after tax income" and constitute "a mere 43% of the marital standard of living," while providing David "more than 97% the marital standard of living . . . ."

She countered that 40 percent of David's posttax income would be "much more reasonable." Such an allocation would "put [her] at 54% of [her] marital standard of living, and [David's] would still be much higher . . . at nearly 87%." To reach that amount—about $32,256 per month—Marcia requested that permanent spousal support be set at $19,000 per month as well as 20.8 percent of David's income above his "base" income of $919,000.

In December 2022, the court issued a proposed statement of decision on permanent spousal support. It analyzed the applicable statutory factors for setting spousal support and tentatively set the support amount at $18,000 per month plus "18% of the value of" David's annual stock award "up to $700,000." Marcia filed objections to the proposed statement of decision, and David filed a response to Marcia's objections. The court's final statement of decision, issued in February 2023, reached the same result.

4

**III.**  *The Trial Court Held Separate Hearing on Attorney Fees*

Although touched on during trial, the issue of attorney fees was briefed and argued separately.  Combined, David and Marcia spent over $3.2 million on attorney fees.

Marcia requested that the prior $225,000 in advances for attorney fees be awarded to her and that the court award her an additional $570,000 toward attorney fees and costs.  David opposed the request, arguing that Marcia had adequate access to legal representation due to his settlement payment and temporary support payments and that Marcia failed to show the fees she incurred were reasonably necessary.

In January 2023, the court issued a final order on attorney fees.  The court found that there was no disparity in access and ability to pay.  It accordingly awarded Marcia the $225,000 in advanced fees but denied her request for additional attorney fees.

Marcia appealed the judgment on permanent spousal support and attorney fees.[2]

## DISCUSSION

**I.**  *The Permanent Spousal Support Award*

A.    *Applicable Law*

Permanent spousal support is governed by a statutory scheme that prescribes factors the trial court must consider and apply.  (See Fam. Code, §§ 4300–4360; *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 302 (*Cheriton*), superseded by statute on other grounds as stated in *In re*

---

[2] Although the judgment, which incorporated both the final statement of decision and the attorney fees order, was not entered until May 23, 2023, two months *after* Marcia's notice of appeal, we exercise our discretion to treat the appeal as having been filed immediately after entry of the judgment. (Cal. Rules of Court, rule 8.104(d)(2).)

*Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1049.)[3]  In doing so, the court exercises broad discretion in weighing and balancing the statutory factors, " ' "with the goal of accomplishing substantial justice for the parties in the case before it." ' " (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 108 (*Ciprari*); *Cheriton*, at p. 312 ["the 'purposes of spousal support inevitably vary from case to case, depending upon the parties and the facts and circumstances of the case' "].)

Accordingly, the deferential abuse of discretion standard guides our review of permanent spousal support awards.  (*Ciprari, supra*, 32 Cal.App.5th at p. 110.)  Whether the trial court applied the correct legal standard in exercising its discretion is a question of law we review de novo. (*Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389, 397.)  Conversely, we examine the trial court's factual determinations for substantial evidence and will uphold its exercise of discretion " 'as long as its determination is within the range of the evidence presented.' " (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 197.)  " ' "Because trial courts have such broad discretion, appellate courts must act with cautious judicial restraint in reviewing these orders." ' " (*In re Marriage of McLain* (2017) 7 Cal.App.5th 262, 269.)

Because we presume the judgment is correct, findings of fact are liberally construed to support the judgment and we resolve any evidentiary conflicts or reasonable inferences in support of the trial court's determination.  (*Ciprari, supra*, 32 Cal.App.5th at pp. 93–94.)  To avoid implied findings in favor of a judgment, the challenging party must make specific objections to the statement of decision.  (*Id.* at p. 94.)

---

[3] All further statutory references are to the Family Code unless otherwise indicated.

6

B.   *Trial Court Properly Considered the Marital Standard of Living in Determining Permanent Spousal Support Award*

Marcia faults the trial court for "fail[ing] to relate its support award to Marcia's needs based on the [marital standard of living]."  We disagree.

As required by section 4332, the trial court made "specific factual findings with respect to the standard of living during the marriage . . . ." (§ 4332; *In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 825.)  And the statement of decision makes plain that the court used the marital standard of living "as a reference point against which the other statutory factors" were weighted.  (*Cheriton, supra*, 92 Cal.App.4th at p. 303.)[4]  Marcia does not dispute the court's characterization of the parties' "upper-class Marin County lifestyle" during the marriage.  (See *In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 490–491 (*Smith*).)  Nor does she allege that the court failed to consider any of the statutory factors or challenge any of the court's factual findings regarding those factors.

Instead, Marcia claims that the trial court erroneously relied on her "needs" to determine the amount necessary to replicate her marital standard of living.  She focuses on the court's statement that her " 'needs are commensurate with the standard of living established during the marriage' . . . ."  She insists the support award must instead be

---

[4] "The other statutory factors include:  contributions to the supporting spouse's education, training, or career; the supporting spouse's ability to pay; the needs of each party, based on the marital standard of living; the obligations and assets of each party; the duration of the marriage; the opportunity for employment without undue interference with the children's interests; the age and health of the parties; tax consequences; the balance of hardships to the parties; the goal that the supported party be self-supporting within a reasonable period of time; and any other factors deemed just and equitable by the court.  (§ 4320, subds.(b)–(*l*).)" (*Cheriton, supra*, 92 Cal.App.4th at pp. 303–304.)

commensurate with the $60,000 per month per party that the parties "stipulated to [as a marital standard of living]." Her arguments are unpersuasive for several reasons.

First, Marcia overstates the parties' stipulation to her expert's marital standard of living report. The parties did *not* agree on the amount necessary to maintain their marital standard of living; rather, the court accepted a stipulation to seven pages of the report that calculates the couple's average posttax income from 2014 to 2018 was roughly $120,000 per month. Marcia overlooks that a couple's income does not define their marital standard of living. (*Smith, supra*, 225 Cal.App.3d at p. 491.)

Second, Marcia misapprehends the definition of the marital standard of living, which is the "reasonable needs commensurate with the parties' general station in life." (*Smith, supra*, 225 Cal.App.3d at p. 491.) It is not "a mathematical standard." (*Ibid.*) In determining a party's reasonable needs, courts need not accept a party's list of "projected" expenses (*id.* at p. 487) nor rely on a party's "actual expenditures." (*In re Marriage of Weinstein* (1991) 4 Cal.App.4th 555, 565.)[5]

Tellingly, Marcia neglects to mention that she requested the trial court to set the support award around $32,256 per month, which she asserted would constitute only 54 percent of the marital standard of living. The

---

[5] To the extent that Marcia complains the trial court mistook her monthly expenses during trial as commensurate with her needs, she is mistaken. The court expressly disregarded attorney fees in determining that the "parties' estimated needs" could be met by David's income. The court further acknowledged that both parties claimed to have "experienced a drastic reduction in standard of living since separation." But, given "the inordinate amount of money" the parties "spent on attorney's fees while aggressively litigating this case," the court reasonably concluded their purported deprivations would be transient.

amount the court actually awarded—about $28,500 per month—is within the ballpark.

There is ample evidence that Marcia can replicate her "upper-class Marin County lifestyle" with a support payment in that range. Marcia received an unencumbered multi-million-dollar residence in the couple's division of assets, and she received a nearly $900,000 equalization payment from David in addition to $280,000 in assets she already possessed. We may infer that the trial court implicitly found Marcia could adequately supplement her spousal support with the returns on these assets. (*In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 52–53 [court may consider the supported spouse's investment income]; *In re Marriage of Ackerman, supra*, 146 Cal.App.4th at p. 211 [court may impute a reasonable return on assets]; *Ciprari, supra*, 32 Cal.App.5th at pp. 93–94 [reasonable inferences are to be drawn in support of the trial court's decision].)

Moreover, the marital standard of living " 'is neither a floor nor a ceiling for a spousal support award.' " (*Ciprari, supra*, 32 Cal.App.5th at p. 110.) "After weighing the marital standard of living against the other statutory factors, 'the court may "fix spousal support at an amount greater than, equal to or less than what the supported spouse may require to maintain the marital standard of living, in order to achieve a just and reasonable result under the facts and circumstances of the case." ' " (*Ibid.*; *In re Marriage of Zywiciel* (2000) 83 Cal.App.4th 1078, 1081 [marital standard of living "is not in and of itself sufficient to sustain an award of permanent support"].) Additionally, "the credibility and believability of the parties, an understanding of human nature, and a sense of what amounts are reasonable for various items of claimed expenses are all factors not set forth

9

in the statute, but, in the exercise of discretion, they inevitably influence the decision ultimately made." (*Smith, supra*, 225 Cal.App.3d at p. 494.)

Here, the trial court found David "suffer[s] from a liquidity hardship" due to his cash transfers to Marcia, owed a projected $470,000 in taxes, took on debt to finance the litigation, and is "dependent in part on" a volatile stock to maintain his standard of living.[6] Marcia does not challenge these factual findings, and she does not articulate which needs established by the marital standard of living she will no longer be able to enjoy due to the underwhelming support award. (Cf. *Smith, supra*, 225 Cal.App.3d at p. 493 [spouse "did not present evidence that the amount of support, as modified, is insufficient to permit her to live at a standard comparable to what would have been a reasonable marital standard"].)

Without such a showing, any disparity between the parties' incomes is immaterial. (*In re Marriage of Ackerman, supra*, 146 Cal.App.4th at p. 208.) Marcia's reliance on *Ciprari* is inapt. There, the parties sold the marital home and each "receive[d] half of the proceeds . . . ." (*Ciprari, supra*, 32 Cal.App.5th at p. 107.) So rather than a multi-million-dollar home, as Marcia has here, the wife had a "separate property condominium she co-own[ed] with her sister . . . ." (*Id.* at p. 109.) The husband's expected monthly income was $47,040; the wife's monthly income was $20,790, which "even when combined" with the $5,000 support award "would not support a standard of living equivalent to the marital standard of living described by the court."

---

[6] We also observe that, while the supporting spouse's ability to pay is "a key factor" in setting spousal support (*Cheriton, supra*, 92 Cal.App.4th at p. 304), the supporting spouse's "earning capacity usually is considered in setting spousal support only where the record shows the supporting spouse has deliberately attempted to avoid family financial responsibilities." (*In re Marriage of Rosen, supra*, 105 Cal.App.4th at p. 825.) That is not the case here.

(*Id.* at pp. 109–110.)  The Court of Appeal could not sustain such a disparity because the trial court "disregarded" the wife's I&E declaration, leaving the Court of Appeal "to guess what evidence, if any, supported the trial court's determination that the support award is sufficient to meet [her] 'needs.' " (*Id.* at pp. 110–111.)  Similarly, *In re Marriage of Beust* (1994) 23 Cal.App.4th 24, at pages 29–30, is distinguishable because the trial court "fail[ed] to give any weight to [the supported spouse's] evidence of continuing need" and erroneously "declared there was no evidence of [her] inability to be self-supporting."  Marcia's other authorities are inapposite.  (*In re Marriage of Andreen* (1978) 76 Cal.App.3d 667, 672 [supported spouse "faced a shaky economic situation and a shaky economic future"]; *In re Marriage of Ramer* (1986) 187 Cal.App.3d 263, 273 [it was "abundantly clear the new community was living well while wife and the dependent child were not"].)

In sum, the trial court made specific and uncontested factual findings as to the marital standard of living, methodically addressed all the statutory factors, and awarded Marcia nearly 90 percent of the amount she requested.  Accordingly, we conclude the trial court gave the marital standard of living its proper due in determining the support award.

C.    *Trial Court Did Not Err in Refusing to Adjust Marital Standard of Living for Inflation*

Marcia misreads the trial court's statement of decision regarding inflation.  The court did not state that it could not consider the effects of inflation on marital standard of living.  Rather, the court rejected Marcia's unsubstantiated assertion that the marital standard of living should be calculated from the couple's average posttax income with an upward adjustment based on the consumer price index.  Again, marital standard of living is not a mathematical standard determined by posttax income.  (*Smith, supra,* 225 Cal.App.3d at p. 491.)

11

Even if it were, the court did not need to accept Marcia's expert's assertion that the consumer price index—an average change in prices to a certain basket of goods and services—captures the same change in prices to the expenditures and amenities that define Marcia's standard of living. Indeed, considering that Marcia pays no rent or mortgage and that "savings" constitute a significant amount of her asserted marital standard of living (see *In re Marriage of Drapeau* (2001) 93 Cal.App.4th 1086, 1097–1098 [savings history considered an element of marital standard of living]), such a conclusion would likely be unsound. Marcia's authorities do not state otherwise. (*In re Marriage of Davis* (1983) 141 Cal.App.3d 71, 73, fn. 2 [judicial notice of the impact of inflation appropriate when supported spouse lived on a fixed income]; *In re Marriage of Hoffmeister* (1984) 161 Cal.App.3d 1163, 1172, fn. 7 [inflation "[c]onceivably" a change in circumstance justifying modification of spousal support].) Thus, the court did not abuse its discretion in rejecting Marcia's asserted inflation adjustment to the marital standard of living.

D.    *Trial Court Did Not Abuse Its Discretion by Capping Bonus Support*

Marcia's argument that capping her "bonus support" violated her constitutional right to due process is meritless. Due process only requires " 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' [Citation.]" (*In re A.S.* (2012) 205 Cal.App.4th 1332, 1342.) Such conditions were met here.

Both parties requested that the trial court set the permanent support award at a fixed monthly amount plus a percentage of David's income in "excess" of his "base" income. (See *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33, 50 [upholding award including a percentage of supporting

12

spouse's bonus].)  During trial, Marcia's counsel further observed the court could impose a cap on bonus support, and Marcia does not challenge this on appeal.  (See *In re Marriage of Kerr* (1999) 77 Cal.App.4th 87, 95 (*Kerr*) [remanding for family court to "set[] a maximum amount" of percentage support award "proportionate" to the marital standard of living].)

In its proposed statement of decision, the trial court previewed that it intended to set the support award at a fixed monthly amount plus 18 percent of the first $700,000 of the value of David's annual stock award.  The proposed statement of decision stated the court's view that David's ability to maintain his marital standard of living depended on recouping these stock awards.  Marcia took the opportunity to object to the proposed statement of decision order.  It is therefore irrelevant that David did not formally request such a cap.  Due process is satisfied under these circumstances.

As discussed *ante*, Marcia fails to show that the support award leaves her unable to meet her reasonable needs commensurate with her lifestyle during the marriage.  Thus, her contention that the "maximum amount of permanent monthly support of just $28,500" due to the cap is "far, far below the stipulated [marital standard of living]" fails.  (Italics omitted.)  Again, under these circumstances, any income disparity between the parties due to the stock's potential above-average performance is immaterial.  (*In re Marriage of Ackerman, supra*, 146 Cal.App.4th at p. 208.)

Nor did the trial court abuse its discretion by limiting the bonus support award to income from David's annual stock grants.  The record demonstrates the court carefully weighed and considered the parties'

13

circumstances—including David's historical and projected income streams—before exercising its broad discretion to make its support order.[7]

## II.    *Trial Court Did Not Err in Denying Request for Attorney Fees*

Marcia asserts the trial court abused its discretion in denying her request for attorney fees.  She is wrong.

It is black letter law that "[a] trial court is not required to issue a statement of decision for an attorney fee award." (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 981 (*Falcone & Fyke*).)  She cites no authority stating otherwise on the grounds that a party requested a statement for decision on attorney fees or that the trial dealt with the issue.

Marcia's other contention, that the trial court abused its discretion by "almost exclusively" focusing on the parties' relative liquidity rather than their relative circumstances, fares no better.  Despite tacitly conceding David's lack of liquidity, she argues David can "pay the [requested] fees over time" or "fund the requested fee award from his significant assets."  She misapprehends the purpose of attorney fees and our role.

The trial court must "ensure that each party has access to legal representation" and "shall" order "reasonable" attorney fees if it finds there is a disparity in access and ability to pay.  (§ 2030, subd. (a)(1)–(2).)  In doing so, the court must determine what is "just and reasonable under the relative

---

[7] We deny Marcia's requests for judicial notice of alleged facts that occurred after the trial, specifically the stock price and medical conferences featuring David.  If Marcia maintains there has been a material change in circumstances, such as an increase in David's ability to pay and/or an increase in her needs, then she may seek a modification to the support award.  (See *In re Marriage of Shimkus* (2016) 244 Cal.App.4th 1262, 1272–1273.)  Because theirs was a marriage of long duration, the trial court indefinitely retains jurisdiction over spousal support, unless the right to support has been terminated by court order, agreement of the parties, or operation of law.  (§ 4336, subds. (a)–(b).)

circumstances of the respective parties." (§ 2032, subd. (a).) "In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320." (*Id.*, subd. (b).) The financial resources of the parties "are only one factor for the court to consider . . . ." (*Ibid.*)

The trial court has broad discretion in awarding attorney fees. (*Falcone & Fyke, supra*, 203 Cal.App.4th at p. 975.) "[W]e will not reverse absent a showing that no judge could reasonably have made the order, considering all of the evidence viewed most favorably in support of the order," so long as the record reflects the court considered the statutory factors in exercising that discretion. (*Ibid.*)

We decline Marcia's invitation to second-guess the trial court's findings and reweigh the parties' respective circumstances. The court's order recited many of the same findings from its analysis of the section 4320 factors in its statement of decision. It also emphasized Marcia's temporary support payments and that she "shall continue to receive spousal support . . . ." Nonetheless, the court granted Marcia's request to award the prior $225,000 in advances as attorney fees. Having done so, the court concluded there was no disparity in access and ability to pay because Marcia "has significant liquid assets" while David had exhausted his liquid funds and "has significantly more liabilities than assets." So while the parties' relative liquidity featured prominently in its analysis, the court properly centered their access to legal representation and ability to pay in the context of the broader circumstances.

15

The record makes clear that Marcia's authorities are inapposite. (See *In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1314–1315 [supported spouse lacked "any investment income or assets" and only had income from $5,000 in support]; *In re Marriage of Martin* (1991) 229 Cal.App.3d 1196, 1201 [supporting spouse claimed he was unable to pay *spousal support* due to an equalization payment].)

Marcia's other objections to the trial court's ruling are off base. It did not "indicate[] she was saving $15,000 per month." Quite the opposite, it acknowledged that Marcia asserted such savings constituted her marital standard of living but that "she now currently states she is not saving money . . . ." Separately, we do not know what to make of her assertion that David "manipulate[d]" his finances so that the same loan on his 2021 I&E declaration still existed at the time of the January 17, 2023, hearing. Given that David agreed to an equalization payment of nearly $900,000 and accrued over $2 million in attorney fees, there appears nothing untoward that this loan is still on his books.

It is true that Marcia's financial wherewithal does not foreclose awarding her further attorney fees. (See § 2032, subd. (b); *Falcone & Fyke, supra*, 203 Cal.App.4th at p. 975.) But the record demonstrates the trial court adequately considered the relative financial circumstances of the parties and came to a reasonable conclusion. We therefore affirm.

## DISPOSITION

The judgment is affirmed. Appellant will bear the cost of the appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

16

                                    Jackson, P. J.

WE CONCUR:

Burns, J.
Chou, J.